## CASE NOS. 23-1055 & 23-1075

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**SARAH LIEBERENZ, individually and as personal representative of the Estate of Jackson Maes, deceased,**

Plaintiff - Appellee/Cross-Appellant,

v.

**KENNETH WILSON, in his individual capacity**

Defendant - Appellant/Cross-Appellee,

and

**BOARD OF COUNTY COMMISSIONERS OF SAGUACHE, COLORADO, in its official capacity, et al.,**

Defendants/Cross-Appellees.

---

## KENNETH WILSON'S OPENING BRIEF

---

Appeal from the United States District Court for the District of Colorado
The Honorable Judge Nina Y. Wang
Civil Action No. 1:21-cv-00628-NYW-NRN

---

Marni Nathan Kloster
Nicholas C. Poppe
Nathan Dumm & Mayer P.C.
7900 E. Union Avenue, Suite 600
Denver, CO  80237
Tel: (303) 691-3737
*Attorneys for Defendant Kenneth Wilson*
ORAL ARGUMENT IS REQUESTED

i

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| **SARAH LIEBERENZ, individually and as personal representative of the Estate of Jackson Maes, deceased** | |
| Plaintiff - Appellee/Cross-Appellant, | Case Nos.: 23-1055 & 23-1075 |
| v. | |
| **KENNETH WILSON, in his individual capacity** | |
| Defendant - Appellant/Cross-Appellee, | |
| and | |
| **BOARD OF COUNTY COMMISSIONERS OF SAGUACHE, COLORADO, in its official capacity, et al.,** | |
| Defendants/Cross-Appellees. | |

---

On Appeal from United States District Court
for the District of Colorado

The Honorable Judge Nina Y. Wang

Civil Action No. 1:21-cv-00628-NYW-NRN

---

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................1

TABLE OF AUTHORITIES ..........................................................................3

PRIOR OR RELATED APPEALS..................................................................6

JURISDICTIONAL STATEMENT .................................................................6

I. STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................7

II. STATEMENT OF THE CASE.................................................................8

III.     SUMMARY OF THE ARGUMENT ....................................................16

IV.     ARGUMENT.........................................................................................18

   1.    The sliding scale approach to qualified immunity conflicts with U.S.
Supreme Court precedent....................................................................18

     A.   Standard of Review. ................................................................18

     B.   The district court's order denying qualified immunity was possible only by
virtue of the sliding scale approach ..................................................19

     C.   The sliding scale is inconsistent with U.S. Supreme Court jurisprudence –
the Court should retire its application...............................................22

       i.   *The sliding scale cannot be supported by the U.S. Supreme Court's
decision in* Hope v. Pelzer .......................................................23

       ii.  *Recent U.S. Supreme Court precedent stands in direct contravention to
the sliding scale* .......................................................................27

     D.  Even in the absence of U.S. Supreme Court precedent, the sliding scale is
unworkable because of an absence of clear guidelines for when or how it
applies. ................................................................................. 29

     E.  To the extent the sliding scale remains viable, the district court erred in
applying it in this case ......................................................................37

   2.    Under either the sliding scale or the immunity analysis set forth by the U.S.
Supreme Court, Captain Wilson was entitled to qualified immunity given the
lack of clearly established case law ....................................................40

     A.   Standard of Review. ................................................................40

B.    Neither Ms. Lieberenz nor the district court cited case law that would have put Captain Wilson on notice that his actions were unconstitutional ...............40

C.    Both Ms. Liebernez and the district court abandoned the clearly established analysis with respect to her claim of supervisory liability .............47

V.    CONCLUSION.....................................................................................50

STATEMENT AS TO ORAL ARGUMENT..............................................................50

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .........................................51

CERTIFICATE OF DIGITAL SUBMISSION ..........................................................52

CERTIFICATE OF SERVICE ..................................................................................53

ATTACHMENT: DISTRICT COURT MEMORANDUM OPINION AND ORDER (ECF 207) FILED 02/03/2023 ................................................................55

## TABLE OF AUTHORITIES

Cases

*Aldaba v. Pickens,* 844 F.3d 870 (10th Cir. 2016)....................................................26

*Apodaca v. Raemisch,* 864 F.3d 1071 (10th Cir. 2017)............................................30

*Brosseau v. Haugen,* 543 U.S. 194 (2004) .............................................................25

*Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015).........................19

*Casey v. City of Federal Heights,* 509 F.3d 1278 (10th Cir. 2007)...... 23,24,38,34,35

*City of Escondido, Cal. v. Emmons,* 139 S. Ct. 500 (2019)....................................27

*City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9 (2021)...................................... 22,27

*Cox. v. Glanz*, 800 F.3d 1231 (10th Cir. 2015) ........................ 18,30,42,43,46,47,49

*Cox. v. Wilson*, 959 F.3d 1249 (10th Cir. 2021).....................................................30

*Crane v. Utah Dept. of Corrections,* 15 F.4th 1296 (10th Cir. 2021)
.......................................................................... 17,31,32,36,37,38,39,41,42,47,49

*Daniels v. Glase,* 198 F.3d 257, 1999 WL 10205222 (10th Cir. 1999) ..................45

*Dist. of Columbia v. Wesby,* 138 S. Ct. 577 (2018).................................................27

*Elliot v. Cheshire County,* 940 F.2d 9 (1st Cir. 1991)........................ 43,44,45,46,49

*Estate of Hammers v. Douglas Cnty., Kansas Bd. of Commissioners,* 303 F. Supp
3d 1134 (D. Kan. 2018).......................................................................................35

*Estate of Lillis by and through Lillis v. Bd. of Cnty. Comm'rs of Arapahoe County,*
2019 WL 2866687 (D. Colo. July 2, 2019)..........................................................35

*Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013) ...............................................6

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ................................... 24,25,34

*Fraiser v. Evans,* 992 F.3d 1003 (10th Cir. 2021)..............................................26,30

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................16,23-29,37

*Irizarry v. Yehia,* 38 F. 4th 1282 (10th Cir. 2022)..........................................43,44

*Knopf v. Williams*, 884 F.3d 939 (10th Cir. 2018).............................................30,34

*Leiser v. Moore,* 903 F.3d 1137 (10th Cir. 2018).....................................................44

*Lowe v. Raemisch*, 864 F.3d 1205 (10th Cir. 2017) ................................................22

*Lyn M v. Premera Blue Cross*, 966 F.3d 1061 (10th Cir. 2020) ...................... 18,40

*Mullenix v. Luna,* 577 U.S. 12, 136 S. Ct. 305 (2015) ...................................... 28,40

*Pauly v. White,* 814 F.3d 1060 (10th Cir. 2016) *vacated*, 580 U.S. 73, 79 (2017) ..28

*Payne v. Tennessee,* 501 U.S. 808 (1991) .................................................................30

*Perry v. Durborow*, 892 F.3d 1116 (10th Cir. 2018)................................... 7,8,48,49

*Quinn v. Young,* 780 F.3d 998 (2015).......................................................................30

*Turney v. Waterbury,* 375 F.3d 756 (8th Cir. 2004) ........................................... 38,39

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021)...................................20,27,28,29

*Safford Unified School Dist. # 1 v. Redding,* 557 U.S. 364 (2009) ................... 25,26

*Sause v. Bauer,* 859 F.3d 1270 (10th Cir 2017), *overruled by* 138 S. Ct. 2561 (2018)......................................................................................................................28

*Ullery v. Bradely,* 949 F.3d 1282 (10th Cir. 2020)................................ 32,33,36,37

*Vreeland v. Huss*, 2021 WL 1171670, (D. Colo. Mar. 29, 2021)............................22

*White v. Pauly*, 580 U.S. 73, 79 (2017) ............................................................ 27,28

Rules

Fed. R. Civ. P. 56 ...................................................................................................40

Other Authorities

42 U.S.C. § 1983 ....................................................................................................23

*Requiem for the Sliding Scale: The Quiet Ascent – and Slow Death – of the Tenth Circuit's Peculiar Approach to Qualified Immunity*, 20 Wyo. L. Rev. 43 (2020) ..............................................................................................................................23

## PRIOR OR RELATED APPEALS

Appellate Case No. 23-1055 is related to Appellate Case No. 23-1075 and both cases are subject to a combined briefing schedule as set forth in the Court's Order dated March 23, 2023.

## JURISDICTIONAL STATEMENT

In her Complaint, Ms. Lieberenz asserted claims under 42 U.S.C. § 1983; thus, the district court had jurisdiction pursuant to 28 U.S.C. § 1331.

This Court has jurisdiction to review denials of summary judgment involving issues of qualified immunity and may do so on an interlocutory basis. *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013).

The district court entered its order denying Captain Wilson qualified immunity on February 3, 2023. Captain Wilson timely filed his notice of appeal on February 28, 2023.

## I.   STATEMENT OF ISSUES PRESENTED FOR REVIEW

The U.S. Supreme Court has repeatedly held that clearly established law cannot be defined at a high level of generality, but rather must be particularized to the facts of the case. The Tenth Circuit's sliding scale approach allows district courts to find clearly established law even in the absence of precedent with the same or substantially similar facts. Is the sliding scale consistent with modern U.S. Supreme Court jurisprudence?

For the defense of qualified immunity to be denied, a district court must find that Tenth Circuit precedent, or a "consensus" of other circuits, placed the constitutional issue beyond debate. In this case, the district court found clearly established case law based largely on one case from the First Circuit. Did the district court err in finding the law was clearly established with respect to Captain Wilson's liability?

For a claim of supervisory liability, the Tenth Circuit requires a separate analysis of clearly established case law, *i.e.,* one that shows every reasonable supervisor would have known his conduct was unconstitutional. *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018). The district court failed to conduct a second analysis of clearly established law – it just referred back to its previous analysis. Did the district court err in failing to undertake the analysis required by *Perry*?

7

## II.   STATEMENT OF THE CASE[1]

### *Mr. Maes' prior history and arrest*

On November 16, 2019, at approximately 9:45 p.m., Jackson Maes was placed in a cell at the Saguache County Jail ("Jail").[2] (App. Vol. III at 43). Tragically, just thirty-seven minutes later, he took his own life. (App. Vol. III at 44).

Mr. Maes was not known to any of the law enforcement officials named in this lawsuit prior to his arrest, but rather had more recently moved to Saguache County. (App. Vol. I at 150; App. Vol. III at 37). Unbeknownst to the officers, Mr. Maes had a history of depressive disorder and, according to his mother, Sarah Lieberenz, was also an alcoholic. (App. Vol. III at 37).

It was in fact alcohol that precipitated Mr. Maes' encounter with law enforcement on November 16, 2019, when the Sheriff's Office received a call about an intoxicated individual from a concerned citizen. (App. Vol. III at 59). Deputy Elke Wells responded to the call, and upon ascertaining Mr. Maes'

---

[1] As this is an interlocutory appeal of qualified immunity, this Court has jurisdiction to the extent Captain Wilson accepts as true all disputed facts that run in favor of Ms. Lieberenz. *See Perry*, 892 F.3d at 1119-20. Because the district court's errors in denying qualified immunity involve abstract issues of law, for purposes of this appeal only, Captain Wilson accepts the district court's findings of fact, but reserves the right to challenge certain findings at trial or during a later appeal, if necessary.

[2] All citations to the record conform to the following format: App. Vol. # at [page number].

identity, learned that he had a warrant out for his arrest for failure to appear. (App. Vol. III at 60). He was arrested and taken to the Jail. (*Id*.).

When Deputy Wells arrived at the Jail with Mr. Maes, there were three additional County employees at the Jail: Shelby Shields, Miguel Macias, and Captain Kenneth Wilson. (*Id*.).

Ms. Shields was the dispatcher assigned to operate the radios and answer emergency and non-emergency calls from the public. (App. Vol. I at 133-34).  At the time of Mr. Maes' arrest, she had only been employed by the County for two months. (App. Vol. I at 134). The evening of November 16 was hectic for Ms. Shields, as the county radio system was not operating properly, forcing her to do a number of tasks manually. (App. Vol. III at 61).

Mr. Macias was the jailer on duty that evening, responsible for booking in and supervising inmates. (App. Vol. I at 134).

Captain Wilson was actually off duty on the night of November 16, 2019, but had come down to the Jail to assist Ms. Shields in fixing the radio console. (*Id*.). Captain Wilson was the supervisor of the Jail. (*Id*.).

### *Mr. Maes' entry into the Jail*

Consistent with the population of the county, the Jail is small: it contains just four cells and one "tank," the latter of which is designed to house intoxicated or suicidal inmates, as well as inmates with behavioral problems. (App. Vol. III at

9

58). On the night of Mr. Maes' arrest, the tank was occupied by an inmate with

behavioral problems. (App. Vol. III at 60).

The parties agree that Mr. Maes presented as highly intoxicated. (App. Vol. I

at 134). But for the presence of another inmate in the tank, Mr. Maes would have

been placed in the tank to sober up. (App. Vol. III at 60). Instead, Mr. Maes was

placed in Cell One, which was otherwise empty that evening. (*Id*.). Cell One

contains two bunks and a toilet, which is screened for privacy with a curtain. (App.

Vol. I at 167; App. Vol. II at 194). Because of Mr. Maes' level of intoxication, he

was not formally booked into the Jail upon arrival; rather, Captain Wilson and Mr.

Macias simply led him to Cell One and assisted him in getting into a jail uniform.

(App. Vol. I at 134).

### *Interactions in Cell One*

Around twelve minutes after being placed in Cell One, Mr. Maes began

making loud noises by banging into a metal divider. (App. Vol. III at 60). Captain

Wilson and Mr. Macias returned to Cell One, with Deputy Wells following

thereafter. (*Id*.). Upon their entry into the area around Cell One, Mr. Maes was

standing upright in the middle of the cell near the metal divider. (App. Vol. II at

23). The Defendants observed Mr. Maes hit his head against the metal divider.

(App. Vol. III at 77). Deputy Wells told Mr. Maes to get some rest, at which point

Mr. Maes stated "I'm trying to kill myself right now." (App. Vol. III at 60-61). To

10

this comment Captain Wilson responded by asking Mr. Maes "You're trying to kill yourself?" (App. Vol. III at 61). Mr. Maes did not respond to the question and made no further statements in Captain Wilson's presence. (*Id*.) Upon exiting the cell, Captain Wilson believed that something more should be done for Mr. Maes and that he was eligible for placement at a detox facility. (App. Vol. III at 77).

Deputy Wells also exited the area around Cell One and, unbeknownst to Captain Wilson at the time, placed a separate phone call to her supervisor. (App. Vol. III at 78). As a road/courtroom deputy, Deputy Wells was not within the Jail's chain of command, hence her call to Corporal Hansen, her supervising officer. (App. Vol. I at 263). After Deputy Wells relayed her observations, Cpl. Hansen, who was also not involved in the Jail's operation or supervision, stated Mr. Maes needed to be evaluated by mental health, needed to be placed on suicide watch, and could not be released until evaluated by mental health. (App. Vol. I at 264). Deputy Wells stated she then relayed the contents of her conversation with Cpl. Hanson to Captain Wilson. (App. Vol. III at 78).

During the entire time Mr. Maes interacted with certain Defendants in Cell One, Ms. Shields remained in the dispatch room. (App. Vol. III at 61). Indeed, she never interacted directly with Mr. Maes on the evening of November 16. (App. Vol. III at 94). Ms. Shields did, however, place a call to the County's mental health provider regarding Mr. Maes, although she wasn't sure of the exact reason why

11

mental health was needed. (App. Vol. III at 61). Upon receiving the provider's voicemail, she declined to leave a message and ended the call. (*Id*. n.6).

Captain Wilson similarly did not interact with Mr. Maes again. (App. Vol. III at 61). Deputy Wells remained at the Jail for a period of time and had a conversation with Ms. Shields about protocols for road deputies, which Ms. Shields found to be somewhat distracting. (App. Vol. I at 208).

### *Final interactions between Mr. Maes and Mr. Macias*

Mr. Macias had several additional discussions with Mr. Maes, the content of which are not relevant to the narrow issues in Captain Wilson's appeal. (App. Vol. III at 61). However, in short, Mr. Maes made several other statements that could be interpreted as related to potential self-harm, but also sought and received food, asked questions about how to make phone calls the next day, and inquired about the process for bonding out. (App. Vol. III at 61). These additional conversations between Mr. Maes and Mr. Macias were not relayed to any other Defendant that evening. (App. Vol. I at 136). The final conversation between the two ended at approximately 10:08 p.m. (App. Vol. III at 61).

Fourteen minutes after the last conversation ended, and about thirty-seven minutes after he was placed in Cell One, Mr. Maes tore down the privacy curtain over the toilet and committed suicide by using the cell bars as a tie-off point. (*Id*.). He perished within approximately three minutes, or around 10:25 p.m. on

November 16, 2019. (*Id*.). Approximately an hour and thirty-eight minutes later, at midnight, Mr. Macias and Ms. Shields were relieved of duty. (App. Vol. III at 61-62). Neither entered the area around Cell One from 10:08 p.m. to midnight. (App. Vol. I at 53 ¶ 144).

### Additional relevant facts

Approximately ten days prior to the events on November 16, 2019, Mr. Macias had submitted his notice of resignation to Sheriff Warwick and Captain Wilson. (App. Vol. III at 60 n.5). Among half a dozen other reasons, Mr. Macias noted a perceived lack of training on certain aspects of his job, although he did not specify which aspects of his job he was referring to. (App. Vol. I at 138).

### Relevant procedural history and district court order

Ms. Lieberenz sued all four County employees who were present at the Jail on November 16, as well as asserted a number of *Monell* claims against the Board of County Commissioners and Sheriff Warwick in his official capacity. (App. Vol. I at 31-66). With respect to Captain Wilson, Ms. Lieberenz asserted two claims against him in his individual capacity: (1) an individual liability claim for deprivation of medical care under the Fourteenth Amendment, and (2) a supervisory liability claim, also for deprivation of medical care, based on his role as the supervisor of the Jail. (App. Vol. I at 63). Ms. Lieberenz also sued Ms.

Shields, Mr. Macias, and Deputy Wells in their individual capacities for failure to provide medical care. (App. Vol. I at 63-64).

Captain Wilson, Ms. Shields, and Deputy Wells all moved for summary judgment and asserted the defense of qualified immunity. (App. Vol. I at 131-57; (App. Vol. I at 226-35). After setting forth the standard for qualified immunity, the district court determined that when viewing the facts in the light most favorable to Ms. Lieberenz, a plausible constitutional violation for deprivation of medical care could be sustained against Captain Wilson in his individual capacity. (App. Vol. III at 76-79).

The district court then turned its attention to the analysis of clearly established law. (App. Vol. III at 79). Critical to this appeal, the district court cited the Tenth Circuit's "sliding scale approach" to clearly established law, despite the fact that Mr. Lieberenz did not seek its application in briefing. (App. Vol. III at 80). After referencing the sliding scale approach, the district court noted that "Plaintiff appears to concede that there is no Supreme Court or Tenth Circuit case law that reflects the same or substantially similar facts as this case." (*Id.*). The district court then went on to discuss four "purported failures" of Captain Wilson in light of Mr. Maes' actions, but immediately concluded that, standing alone, none of them would yield a clearly established constitutional violation by Captain Wilson. (App. Vol. III at 81-82).

14

Yet instead of ending its analysis there, the district court concluded that "the aggregation of these risk factors" could present a clearly established constitutional violation *even in the absence* of case law that was directly on point. (App. Vol. III at 82). The district court thus denied Captain Wilson's request for qualified immunity over the individual capacity claim against him. (App. Vol. III at 82-83).

The district court then briefly addressed the supervisory liability claim against Captain Wilson, stating that "for the reasons articulated above," summary judgment must similarly be denied. (App. Vol. III at 85). The district court did not set forth any additional or different clearly established law that would have placed every supervisor on notice that his conduct was unconstitutional.

The district court granted summary judgment to Defendants Wells and Shields, finding a lack of clearly established law demonstrating that either would have been aware that their actions would impute constitutional liability for failure to provide medical care. (App. Vol. III at 85-96).

Captain Wilson then timely filed the ensuing appeal over the denial of qualified immunity for the two claims asserted against him. (App. Vol. III at 123).

### III.    SUMMARY OF THE ARGUMENT

In an analytical framework that no other circuit court has adopted, the Tenth Circuit allows district courts to use a "sliding scale approach" when evaluating qualified immunity. The Tenth Circuit and its corresponding district courts may find the law was clearly established even if existing precedent is neither on point nor obviously applicable. Several members of this Court have expressed reservations about the continued viability of the approach in light of more modern U.S. Supreme Court jurisprudence on qualified immunity.

Captain Wilson requests that the Court address the viability of the approach and retire it. The sliding scale approach, although perhaps reasonable in the years after the Supreme Court's decision in *Hope v. Pelzer*, has been firmly undermined by subsequent Supreme Court precedent that has not only clarified the limited scope of the decision in *Hope*, but also repeatedly emphasized that clearly established law cannot be established at a high level of generality.

Beyond being contrary to U.S. Supreme Court precedent, Captain Wilson asserts that the sliding scale approach is unworkable and lacks clear guidelines by which district courts can reach consistent conclusions on qualified immunity. Because it relies on a subjective assessment of how "egregious" a defendant's conduct is, there are no standards or criteria by which to establish a baseline for comparison from one case to the next. Indeed, whether it should be applied *at all* is

16

uncertain, as the Tenth Circuit has not consistently applied the approach to every case where qualified immunity was asserted as a defense.

This case is perfectly framed to evaluate the ongoing viability of the sliding scale approach, as the district court held there was not an on-point U.S. Supreme Court or Tenth Circuit precedent that governed Captain Wilson's conduct, thereby making qualified immunity applicable. The district court's order that Captain Wilson's actions "in the aggregate" could lessen the burden to demonstrate clearly established law can only be rationalized under the sliding scale approach. It can and should be overturned so the Tenth Circuit is aligned with all other circuit courts and the U.S. Supreme Court with respect to evaluating clearly established law.

Even if the Tenth Circuit is not inclined to retire the sliding scale approach, the district court's analysis of clearly established law was fundamentally flawed. The district court relied largely on two cases for its clearly established analysis, with a single citation to a third case. The primary case was a First Circuit opinion from 1991, which hardly meets the threshold of a "consensus" of circuits. In any event, the facts of that case are distinguishable and would not have put Captain Wilson on notice of a clearly established constitutional violation. The district court also cited a Tenth Circuit case, *Crane v. Utah Dept. of Corrections*, yet the opinion in that case was issued in 2021, or two years *after* Mr. Maes' suicide. That leaves

17

the district court with one additional citation to a 2015 case, *Cox. v. Glanz*, which, while establishing general rules governing inmate care, is not sufficiently on point to govern Captain Wilson's conduct. Thus, the district court erred in finding that the law was clearly established with respect to Ms. Lieberenz's individual capacity claim against Captain Wilson for deprivation of medical care.

With respect to the claim of supervisory liability against Captain Wilson in his individual capacity, both Ms. Lieberenz and the district court failed to cite any clearly established law demonstrating that his actions as a supervisor were unconstitutional. Because a separate analysis of clearly established law must be undertaken for supervisory liability, the district erred in denying Captain Wilson's motion for summary judgment over that claim as well.

## IV.    ARGUMENT

### 1.    The sliding scale approach to qualified immunity conflicts with U.S. Supreme Court precedent.

A.    Standard of Review.

Motions for summary judgment under Rule 56 are reviewed *de novo* by the Tenth Circuit. *Lyn M v. Premera Blue Cross*, 966 F.3d 1061, 1064 (10th Cir. 2020).

B.    The district court's order denying qualified immunity was possible only by virtue of the sliding scale approach.

Before addressing the validity of the sliding scale approach, it is first necessary to dissect the district court's order with respect to qualified immunity.

The district court began its assessment of qualified immunity by asking whether, based on the facts taken in the light most favorable to Ms. Lieberenz, Captain Wilson knew of and disregarded an excessive risk to Mr. Maes' health or safety. (App. Vol. III at 76-79). The district court answered that question in the affirmative based on a number of factual disputes that it construed in Ms. Lieberenz's favor. (App. Vol. III at 79).

The district court then turned to the second prong of qualified immunity and correctly noted that Ms. Lieberenz bore the burden of demonstrating that the law was clearly established. (App. Vol. III at 79-80). The district court also correctly held that "a plaintiff may satisfy this clearly-established-law standard by identifying an on-point Supreme Court or published Tenth Circuit decision that establishes the unlawfulness of the defendant's conduct," or, alternatively, establish a weight of authority from other courts. (App. Vol. III at 80). But before engaging in an analysis of clearly established law, the district court also noted that the "[t]he Tenth Circuit employs a sort of sliding scale analysis in analyzing precedent," citing to this Court's decision in *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). (*Id.*).

19

After setting forth the standard for clearly established law, the district court then seemingly broke its application of the standard into three parts.

First, the district court noted that "Plaintiff appears to concede that there is no Supreme Court or Tenth Circuit case law that reflects the same or substantially similar facts as this case." (*Id.*). The district court's assessment of qualified immunity could – and should – have ended there, as that standard is exactly what the U.S. Supreme Court has demanded plaintiffs meet when overcoming the defense of qualified immunity. *See, e.g., Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7-8 (2021) ("for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (internal citations and quotations omitted).

Instead, the court continued on to the second part of its clearly established analysis, citing four "purported failures" of Captain Wilson and concluding that each of them, standing alone, "would *not* persuade this Court that a clearly-established constitutional right existed." (App. Vol. III at 81) (emphasis added). Indeed, the district court went to some length in describing the state of the law surrounding jail suicides and concluded that a number of Mr. Maes' traits and Captain Wilson's actions did not give rise to clearly established case law placing

every officer on notice of a substantial risk to inmate health or safety. (App. Vol. III at 81-82).

Yet instead of concluding its qualified immunity analysis based on Plaintiff's concession and its own assessment of the relevant case law, the district court went to the third section of its clearly established analysis and applied a relaxed standard of qualified immunity. (App. Vol. III at 82). The district court held that "despite the lack of a Supreme Court or Tenth Circuit case that has facts on all fours," the law could be clearly established based on "the aggregation of these risk factors…" (*Id*.). While not stated directly, the only logical conclusion that can be derived from the district court's order is that it relied upon the sliding scale approach, relaxing Plaintiff's burden based upon its own assessment of Captain Wilson's conduct "in the aggregate."

This conclusion is borne out by the district court's ensuing analysis, in which it did not cite to a Tenth Circuit or U.S. Supreme Court case that placed the constitutionality of Captain Wilson's conduct "beyond debate," but rather cited the general broad proposition that a prison official can be "deliberately indifferent if they fail to take reasonable steps to protect a pretrial detainee or an inmate from suicide when they have subjective knowledge that person is a substantial suicide risk." (*Id*.). While the district cited to two cases, one from each the First and Tenth Circuits (notably, the Tenth Circuit case was issued after the events in this case), in

21

neither instance did the district court engage in any analysis demonstrating that "every reasonable officer would conclude his conduct was unlawful *in the situation he confronted*." *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) (internal citation omitted) (emphasis added).

The district court's order presents a clear need to re-examine the sliding scale approach, as the district court – and Ms. Lieberenz – conceded that no clearly established case law governed Captain Wilson's actions. Thus, the only route to avoidance of summary judgment was to diverge from U.S. Supreme Court precedent and apply the relaxed sliding scale.

C.   The sliding scale is inconsistent with U.S. Supreme Court jurisprudence – the Court should retire its application.

In recent years, this Court has expressed its own concern over the validity of the sliding scale, recognizing that it arguably conflicts with U.S. Supreme Court precedent because it "may allow us to find a clearly established right even when a precedent is neither on point nor obviously applicable." *Lowe v. Raemisch*, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017). The uncertainty has trickled down into lower courts, which continue to apply it, but acknowledge that its origins and future may be uncertain. *See, e.g., Vreeland v. Huss*, No. 18-cv-00303-PAB-SKC, 2021 WL 1171670, at *8 (D. Colo. Mar. 29, 2021) (analyzing *Lowe* and uncertainty over application of the test).

Captain Wilson respectfully submits that the sliding scale has no basis in U.S. Supreme Court jurisprudence and it certainly conflicts with the most recent pronouncements of the Court. It should thus be retired in this Circuit – which is the only circuit court to have ever adopted it in § 1983 jurisprudence.

>    i.    *The sliding scale cannot be supported by the U.S. Supreme Court's decision in* Hope v. Pelzer.

The sliding scale arguably took root in the Court's decision in *Casey v. City of Federal Heights*, where the Court held that "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." 509 F.3d 1278, 1284 (10th Cir. 2007) (internal citations omitted); *see also* Mark D. Standridge, *Requiem for the Sliding Scale: The Quiet Ascent – and Slow Death – of the Tenth Circuit's Peculiar Approach to Qualified Immunity*, 20 Wyo. L. Rev. 43 (2020). The Court justified its adoption of the test by citing to *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), claiming that "[t]he *Hope* decision *shifted* the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Casey*, 509 F.3d at 1284 (internal citations omitted) (emphasis added).

But the U.S. Supreme Court's decision in *Hope* did not reflect a fundamental "shift" in how courts should analyze qualified immunity; rather, the Court in *Hope*

merely recognized a narrow *exception* to the plaintiff's burden of demonstrating clearly established law. The Court's limited holding is reflected in the facts of the case, wherein prison guards inflicted unnecessary and wanton pain on the plaintiff by use of a hitching post. 536 U.S. at 741. The Court held that "[a]rguably, the violation was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution." *Id*. The key holding to emerge from *Hope* is that certain constitutional violations, while perhaps committed using novel tools or methods, are nonetheless so patently egregious that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question…" *Id.* (internal citations omitted). At no point did the U.S. Supreme Court identify a new or alternative test that relaxed constitutional standards for all but the patently egregious or malicious case.

To be fair, the majority in *Hope* did articulate that the relevant inquiry was whether the officers had "fair and clear warning" that their conduct was unconstitutional. *Id*. at 746. But respectfully, the Tenth Circuit took this language too far, first in *Casey* and then again in *Fogarty v. Gallegos*, in which it relaxed the clearly established requirement to find that general Tenth Circuit precedent would have put officers on notice that the use of less lethal munitions was constitutionally prohibited in the circumstances facing the officers – despite the lack of existing

precedent stating exactly that. 523 F.3d 1147, 1161 (10th Cir. 2008) ("we acknowledge that our precedential opinions have not directly addressed the Fourth Amendment implications of what defendants call 'less lethal' munitions."). From *Fogarty*, the Tenth Circuit and its lower district courts have applied the sliding scale on an evolving basis, seemingly with little contest, thereby relieving plaintiffs of their duty to demonstrate a constitutional violation that was beyond debate.

While the Supreme Court's decision in *Hope* may have been ambiguous with respect to whether it had created a narrow exception, as opposed to a paradigm shift in evaluating clearly established law, subsequent cases have solidified beyond debate that *Hope* is an exception, not a rule. As the Court clarified a few years after the *Hope* decision, a relaxed burden is not appropriate for any case other than an "obvious" one. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

The best example of *Hope's* limited application may be *Safford Unified School Dist. #1 v. Redding*, 557 U.S. 364 (2009), where a middle school administrator ordered a strip search of a teenager suspected of drug contraband. Even though the U.S. Supreme Court had previously articulated Fourth Amendment boundaries for invasive searches of students, and the defendants' search of the student was highly invasive and largely unjustified based on lack of danger to other students, the Court nonetheless granted qualified immunity in light

of uncertainty over whether the search had violated its prior holdings. *Id*. at 378.

The facts of *Safford*, and other similar "close calls," surely provided the U.S.

Supreme Court with a clear opportunity to expand upon *Hope* and adopt some

version of the sliding scale approach now common in the Tenth Circuit. Yet the

Court rejected that approach, and indeed has never adopted any interpretation of

*Hope* that relaxes evaluation of clearly established law in any case other than one

with patently egregious or clearly indefensible conduct.

     The Tenth Circuit itself has also recognized that *Hope's* reach is limited,

holding in 2021 that "*Hope*'s holding historically has been applied to only the "rare

'obvious case,' involving 'extreme circumstances,' or 'particularly egregious'

misconduct. . . ." *Frasier v. Evans*, 992 F.3d 1003, 1021 (10th Cir. 2021) (internal

citations omitted). Yet despite acknowledging *Hope's* limitations, it does not

appear that this Court has ever revisited the sliding scale framework to determine if

it was consistent with U.S. Supreme Court jurisprudence – although it has

acknowledged suspicions to that effect from as early as 2016. *See Aldaba v.

Pickens*, 844 F.3d 870, 874 n.1 (10th Cir. 2016).

     Retracing the sliding scale back to its origins, Captain Wilson submits *Hope*

cannot be read to allow for a more relaxed framework on the question of clearly

established law. And even to the extent there was some ambiguity on how *Hope*

should have been interpreted, the U.S. Supreme Court's application of *Hope's*

holding since its issuance in 2002 leaves no doubt that *Hope* forms an inadequate base upon which to prop up the sliding scale test.

> ii.    *Recent U.S. Supreme Court precedent stands in direct contravention to the sliding scale.*

Having probed the sliding scale's origins, it is now possible to turn to the U.S. Supreme Court's more recent jurisprudence, in which the Court has stated with overwhelming specificity that lower courts cannot define clearly established law at a high level of generality. Thus, even if the sliding scale once enjoyed approval under *Hope*, more recent U.S. Supreme Court precedent has rendered the model obsolete.

In this regard, the Court's most recent pronouncements on qualified immunity can hardly have been clearer. The Court has directed lower courts not to define clearly established law at a high level of generality; rather, the law must be "particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal citations omitted). Since the issuance of the *White* opinion in 2017, the Court has repeated that mandate nearly every year through the present, holding that a relaxed standard "avoids the crucial question whether the official acted reasonably in the *particular circumstances* that he or she faced." *See Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (emphasis added); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (holding same); *Rivas-Villegas*, 142 S. Ct. at 8 (holding same); *City of Tahlequah*, 142 S. Ct. at 11

27

(holding same). In at least one of those circumstances, the U.S. Supreme Court invalidated this Court's application of the sliding scale, albeit the U.S. Supreme Court did not directly comment on the Tenth Circuit's unique analytical framework. *See Pauly v. White*, 814 F.3d 1060, 1084 (10th Cir. 2016) ("Based on our sliding scale test established in *Casey,* 509 F.3d at 1284, we do not agree with the dissent that more specificity is required to put an objectively reasonable officer on fair notice."), *vacated by White v. Pauly*, 580 U.S. 73, 79 (2017).

This Court has already suspected the outcome that Captain Wilson now urges it to confirm: the sliding scale is fundamentally at odds with modern jurisprudence concerning qualified immunity. *See, e.g., Sause v. Bauer*, 859 F.3d 1270, 1276 n.3 (10th Cir. 2017) (questioning sliding scale's ongoing viability), *overruled by Sause v. Bauer*, 138 S. Ct. 2561 (2018).

Indeed, the present case is the perfect example of the analytical gap between the sliding scale and the U.S. Supreme Court's more recent jurisprudence on qualified immunity. The district court correctly held "that there is no Supreme Court or Tenth Circuit case that reflects the same or substantially similar facts as this case." (App. Vol. III at 80). Under *Mullenix*, *White*, *Rivas-Villegas*, and every other modern U.S. Supreme Court case construing qualified immunity, that necessarily ends the analysis. *Mullenix v. Luna,* 577 U.S. 7, 12 (2015).

28

Notably, Ms. Lieberenz did not argue that this case presents an egregious constitutional violation such that *Hope*'s exception would apply, nor would such an argument be persuasive. Indeed, the district court spent the better part of two pages of its order explaining how this was *not* such a case. (App. Vol. III at 81-82). It cited a litany of authority discounting Mr. Maes' various traits and Captain Wilson's responses as not indicative of deliberate indifference. (*Id*.). The district court nonetheless arrived at the wrong legal conclusion because, applying the relaxed standard permitted by the sliding scale, the "aggregation" of factors permitted clearly established law to be derived at a higher level of generality.

But therein lies the rub. If a case is not within the narrow set of cases alluded to in *Hope*, then the only other route to overcoming qualified immunity is compliance with the U.S. Supreme Court's requirement of clearly established law placing the question "beyond debate." *Rivas-Villegas*, 142 S. Ct. at 8. There is no middle ground, and to the extent there ever was, it has been extinguished by repeated pronouncements of the U.S. Supreme Court over the past decade.

> D. Even in the absence of U.S. Supreme Court precedent, the sliding scale is unworkable because of an absence of clear guidelines for when or how it applies.

As an argument in the alternative, Captain Wilson submits that even if modern jurisprudence on qualified immunity permitted application of the sliding

scale, the Court should retire it because of a lack of clear guideposts for how it should dictate lower courts' decisions on qualified immunity.

With waxing and waning levels of enthusiasm over the years, the U.S. Supreme Court has held that "when governing decisions are unworkable or are badly reasoned, this Court has never felt constrained to follow precedent." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (internal citations and quotations omitted). In addition to asserting that the justifications for adopting the sliding scale are no longer valid, *see supra*, Captain Wilson also asserts that this Court should retire its own sliding scale precedent because it has proven unworkable in practice.

As an initial matter, it is not clear whether the sliding scale test applies automatically or must be requested by a plaintiff.

This uncertainty is derived from the fact that the Tenth Circuit has not consistently applied the test to all cases where a qualified immunity defense has been implicated. In at least a half dozen published decisions over the past decade, the Tenth Circuit has decided issues of qualified immunity over all manner of constitutional claims without referring to the sliding scale, much less discussing its application. *See Frasier v. Evans*, 992 F.3d 1003 (10th Cir. 2021); *Cox v. Wilson*, 971 F.3d 1159 (10th Cir. 2020); *Knopf v. Williams*, 884 F.3d 939 (10th Cir. 2018); *Apodaca v. Raemisch*, 864 F.3d 1071 (10th Cir. 2017); *Quinn v. Young*, 780 F.3d 998 (2015); *Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015). If the standard was truly

mandatory, and not a discretionary argument that must be raised by a plaintiff, then application should be standard throughout all federal cases in this Circuit that call for analyses of qualified immunity. It's not.

It would also appear that the sliding scale cannot be automatically applied because the Tenth Circuit has held plaintiffs must make an evidentiary showing that merits a dilution of the clearly established prong. In *Crane v. Utah Dept. of Corrections*, the Tenth Circuit declined to apply the sliding scale because the plaintiff "provides no rationale for why the sliding scale should lower the level of factual similarity required here." 15 F.4th 1296, 1311 (10th Cir. 2021). Specifically, "Ms. Crane neither compares the facts here to cases where we used the sliding scale to lower the level of factual similarity required, nor cites any precedent deeming similar conduct obviously egregious." *Id*. If plaintiffs must make a *separate* argument about the egregious nature of the defendant's conduct in comparison to previously issued Tenth Circuit opinions on the sliding scale, then it stands to reason that district courts cannot automatically apply the approach unless such showing is affirmatively made.

But perhaps with the exception of *Crane*, the Tenth Circuit has issued no clear guidance on whether the sliding scale is triggered automatically or is an "add-on" that must be requested by plaintiffs – engendering confusion in the lower courts. This case is the perfect example. Ms. Lieberenz did not request application

31

of the sliding scale, nor did she offer any specific findings necessary under *Crane*. Yet even in the absence of any factual or legal predicate supplied by Ms. Lieberenz, the district court cited to the sliding scale and apparently applied it, allowing claims against Captain Wilson to proceed even though *all* parties agreed that there was no U.S. Supreme Court or Tenth Circuit case on point governing his conduct. The district court did not appear to follow any consistent guidelines or standards outlining why the sliding scale was appropriate in these circumstances.

This inconsistency plagues Tenth Circuit precedent. The arbitrary nature of the sliding scale is perhaps best exemplified by *Ullery v. Bradley*, 949 F.3d 1282 (10th Cir. 2020), a case that considered whether the law was clearly established such that every reasonable prison guard would have known that sexually assaulting an inmate violated the Eighth Amendment. As the Tenth Circuit stated repeatedly – and with good reason – the defendant's alleged behavior in *Ullery* was deplorable. *Id*. at 1290-91 (discussing "intolerable conduct"). Yet despite a litany of bad acts and intentional sexual misconduct directed at an inmate, this Court cautioned that while the right to be free from sexual assault had *generally* been established, "[t]he dispositive question is whether the violative nature of the *particular* conduct is clearly established." *Id*. at 1291 (internal citations and quotations omitted) (emphasis in original). Thus, despite the defendant's egregious conduct in *Ullery*, the Tenth Circuit apparently declined to relax the clearly established standard

32

through use of the sliding scale, instead noting that for a certain period of time, existing Tenth Circuit precedent failed to show the defendant's specific sexual acts were unconstitutional. *Id*. at 1293 ("these decisions fail to describe the sexual assaults at issue with sufficient detail to clearly establish that Defendant's particular conduct violated the Eighth Amendment."). The Court even issued a justification, of sorts, noting that "[w]e recognize our parsing of the relevant case law and time period may appear unduly formalistic considering the despicable nature of Defendant's alleged misconduct. But this is the task required of us under the qualified-immunity precedents we are obligated to follow." *Id*. at 1301.[3]

If the sliding scale is to be applied in a consistent and predictable manner, it makes little sense that the Court would not apply it in a case with facts as egregious as *Ullery* (intentional sexual assaults), yet permit its application in other cases, including this one. Indeed, as already stated, the district court in this case spent almost two pages explaining why each of Mr. Maes' actions during his thirty-seven-minute tenure in a jail cell did *not* create a substantial risk of suicide. (App. Vol. III at 81). Yet the district court nonetheless held that the law could be established at a higher level of generality based on "the aggregation of these risk factors." But this holding conflicts directly with the holding in *Ullery*, where the

---

[3] The Tenth Circuit ultimately affirmed the district court's denial of qualified immunity, but only because the statute of limitations cut off any claims that otherwise were subject to dismissal on the basis of qualified immunity. *See Ullery*, 949 F.3d at 1301.

court held that *general* prohibitions against sexual assault were insufficient to clearly establish an Eighth Amendment violation – the existing case law must place the *particular* conduct beyond debate (no matter how egregious the defendant's conduct was alleged to be). There appears to be no clear analytical guideline separating one case from the next, thus creating ad hoc and inconsistent decision-making on when the sliding scale is applicable.

Beyond the murky rules triggering its application, it is also unclear whether the sliding scale should or is limited to claims under the Fourth Amendment. As recently as 2018, the Court has used language to the effect of "[o]ur 'sliding scale' approach to qualified immunity in *Fourth Amendment excessive force* cases. . . ." *Knopf v. Williams*, 884 F.3d 939, 950 n.10 (10th Cir. 2018) (emphasis added). The approach has been more consistently applied to Fourth Amendment claims and the Tenth Circuit has hinted on more than one occasion that the approach's rationale is based on the difficulties in finding identical fact patterns in use of force situations. *Fogarty*, 523 F.3d at 1161 (applying sliding scale under *Graham* because "[w]e cannot find qualified immunity wherever we have a new fact pattern."). Given that the two foundational cases for the sliding scale approach, *Casey* and *Fogarty*, both assessed claims of excessive force, it would make sense that the approach would be so limited. And to go one step further, the Tenth Circuit's rationale for relaxing the clearly established prong in those cases was predicated on the idea that

"because excessive force jurisprudence requires an all-things-considered inquiry with 'careful attention to the facts and circumstances of each particular case,' *Graham,* 490 U.S. at 396, 109 S. Ct. 1865, there will almost never be a previously published opinion involving exactly the same circumstances." *Casey*, 509 F.3d at 1284.

But to the extent the approach was supposed to be limited to use of force cases, it has not been so interpreted in the lower district courts. Beyond this case, there exists numerous cases demonstrating the approach's application beyond the Fourth Amendment. *See, e.g.*, *Estate of Hammers v. Douglas Cnty., Kansas Bd. of Commissioners*, 303 F. Supp. 3d 1134, 1151 (D. Kan. 2018) (applying sliding scale approach to inmate medical needs); *Estate of Lillis by and through Lillis v. Bd. of Cnty. Comm'rs of Arapahoe Cnty.*, No. 16-cv-03038-KLM, 2019 WL 2866687, at *6 (D. Colo. July 2, 2019) (same). But the Tenth Circuit has never issued an opinion explicitly expanding the test to other claims, nor explained the justification for doing so.

Finally, application of the sliding scale is inherently subjective and lacks sufficient guidelines to aid lower courts in its consistent application. The approach requires individual judicial officers to assess, on a phantom scale, the degree of "egregiousness" present in a defendant's conduct. But as Judge Bacharach stated best, when applying the sliding scale, "[e]gregiousness can sometimes entail

35

subjective judgments. So if we were to apply our own opinions on the egregiousness, we might differ in our assessments." *Crane v. Utah Dept. of Corrections*, 15 F.4th 1296, 1315 (10th Cir. 2021) (Bacharach, J., concurring). This is perhaps the most glaring defect with the sliding scale: without some standards guiding its application, what one individual finds to be run of the mill negligence could strike another as egregious, and all manner of assessments in between – a problem that becomes magnified once the test percolates to the many district courts in the Tenth Circuit.

On the other side of the scale, there are no standards establishing how "lax" the clearly established law prong becomes as the level of egregiousness increases. If, for example, a defendant's conduct is quite clearly reckless and indifferent, but not malicious, what level of clearly established law is required? How do district courts know that they are within a particular level of egregious conduct such that a commensurate level of specificity can be established in existing case law? These questions remain unanswered and prove that the sliding scale is unworkable, especially from a standpoint of consistency. There is simply no ability to define a scale or range with sufficient specificity to guide lower courts in reaching accurate determinations that can be squared from one case to the next. Again, the comparison between *Ullery* and this case presents the perfect example. Despite egregious conduct in the form of intentional sexual abuse, conduct which was

likely criminal, the Tenth Circuit held the plaintiff in *Ullery* to a higher standard on the clearly established prong than the district court did in this case, where there was no criminal conduct or even intentional malice.

While perhaps an appropriate experiment following the U.S Supreme Court's decision in *Hope v. Pelzer*, the sliding scale has outlived its utility and should be withdrawn in light of its lack of consistency with Supreme Court precedent, its inconsistent application, and its lack of clear analytical guidelines for application in the lower courts.

      E.    To the extent the sliding scale remains viable, the district court erred in applying it in this case.

Even if the Court declines to retire the sliding scale, its application in this case constituted reversible legal error by the district court.

As an initial matter, as already stated, Ms. Lieberenz *never asked* for the less burdensome approach to be applied; indeed, none of her briefings in the lower court even mentioned the term "sliding scale," much less advocated for its use here. As demonstrated above, application of the approach appears to not be automatic; rather, a plaintiff must undertake an affirmative effort to show that the test should be applied.

Relatedly, Ms. Lieberenz failed to direct the district court to any comparable case with similar facts where the sliding scale's use was approved by the Tenth Circuit, as required by *Crane v. Utah Dept. of Corrections*. *See Crane* 15 F.4th at

1311 ("Ms. Crane neither compares the facts here to cases where we used the sliding scale to lower the level of factual similarity required, nor cites any precedent deeming similar conduct obviously egregious."). To the contrary, Ms. Lieberenz alleged only that Mr. Maes was an "obvious" suicide risk and therefore it was incumbent upon Captain Wilson to take steps to abate that risk. In support of her assertion, Ms. Lieberenz cited four characteristics and actions that she claims would have made Mr. Maes' risk of suicide obvious to any jailer. Yet the district court found that each of Mr. Maes' behaviors by were not, in and of themselves, indicative of an acute suicidal ideation such that Captain Wilson would be on notice that he needed to take action.

Of course, the district court went on to conclude that the characteristics "in the aggregate" led it to believe that the law was clearly established, notwithstanding the lack of an on point Tenth Circuit or U.S. Supreme Court decision. But the district court's analysis was still missing the key comparative evidence required by the *Crane* decision, *i.e.*, a comparison between the facts of this case and a previous case where the sliding scale test was endorsed. *Id*.

Indeed, although she never asked for the sliding scale approach in briefing, the only "comparator" case Ms. Lieberenz offered was out of the Eighth Circuit, *Turney v. Waterbury*, 375 F.3d 756 (8th Cir. 2004), which she attempted to use to argue that Captain Wilson's actions were "as egregious as those supporting the

38

reversal of qualified immunity [in that case]." (App. Vol. II at 69). Of course, the

sliding scale is unique to the Tenth Circuit, so references to other circuit court

decisions would be of no use in meeting the burden set forth in *Crane*. And even if

out of circuit precedent could be used to merit application of the sliding scale, the

district court specifically distinguished the facts of *Turney*, noting that the

defendants in that case had knowledge of the decedent's prior suicide attempts.

(App. Vol. III at 83 n.14). As is undisputed in this case, none of the Defendants

had ever interacted with Mr. Maes, and thus had no knowledge of his previous

suicidal tendencies. Thus, even if Ms. Lieberenz had advocated for application of

the sliding scale (she didn't), she lacked the legal precedent necessary to justify its

use by the district court in this case.

Because Ms. Lieberenz never established factual *and* legal grounds

sufficient to warrant application of the sliding scale, the district court erred in

applying the test to avoid compliance with the U.S. Supreme Court's more

stringent standard of identifying case law that placed the constitutional question

"beyond debate." The district court's holding should therefore be reversed.

2.      **Under either the sliding scale or the immunity analysis set forth by the U.S. Supreme Court, Captain Wilson was entitled to qualified immunity given the lack of clearly established case law.**

   A.      Standard of Review.

   Motions for summary judgment under Rule 56 are reviewed *de novo* by the Tenth Circuit. *Lyn*, 966 F.3d at 1064.

   B.      Neither Ms. Lieberenz nor the district court cited case law that would have put Captain Wilson on notice that his actions were unconstitutional.

   Regardless of whether the sliding scale or U.S. Supreme Court approach was utilized, the district court erred in finding the law was clearly established at the time Mr. Maes committed suicide in 2019. Under either test, the dispositive inquiry is whether a right is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11.

   As referenced earlier, the district court noted four "purported failures" of Captain Wilson. (App. Vol. III at 81). Analyzing each in turn, the district court held that existing case law would *not* have put Captain Wilson on notice that those behaviors would have apprised a reasonable jail official of a substantial risk of suicide. (App. Vol. III at 81-82). Instead, the district court combined those factors and held only that an "aggregation" of them showed a clearly established constitutional violation.

40

Yet when the district court reached its analysis of clearly established law, it cited to only two cases purportedly establishing a constitutional violation "in the aggregate." (App. Vol. III at 82). For different reasons, neither of the two cases were sufficient to demonstrate clearly established law with respect to Captain Wilson's actions.

First, the district court cited to *Crane v. Utah Dept. of Corrections* for the proposition that "prison officials are deliberately indifferent if they fail to take reasonable steps to protect a pretrial detainee or inmate from suicide when they have subjective knowledge that person is a substantial suicide risk." (*Id.*). As an initial matter, *Crane* was of no use to determining clearly established law in this case because the Tenth Circuit decided *Crane* in 2021, or some two years after Mr. Maes' suicide. It is axiomatic that a decision issued after an incident has no bearing on clearly established law.

In any event, the factual posture and legal holding of *Crane* are far too dissimilar to have relevance to Captain Wilson's actions. The primary issue in *Crane* was whether it was constitutional to hold a mentally ill inmate in punitive isolation for approximately five months. *Crane*, 15 F.4th at 1301, 1304. While the Tenth Circuit discussed the propriety of housing an inmate with known mental health issues in a cell that facilitated suicide, the Court ultimately held that the law was *not* clearly established because the plaintiff had failed to identify "existing

41

precedent with high levels of factual similarity…" *Id*. at 1311. If anything, *Crane* simply reaffirms Ms. Lieberenz's *general* burden to demonstrate clearly established law.  It certainly does not aid her in demonstrating the law was clearly established with respect to the conduct in this *particular* case.

To be fair, in citing *Crane*, the district did note the Tenth Circuit's earlier holding in *Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015), which was issued prior to Mr. Maes' suicide. But *Cox* fares no better than *Crane* with respect to Captain Wilson's liability. As an initial matter, the key question in *Cox* was whether it was clearly established in 2009 that an inmate had the right to proper suicide screening protocols during the booking process. *Id*. at 1247. Of course, Mr. Maes did not go through a booking process because of his intoxication and was in a cell for less than 45 minutes before he committed suicide. In any event, the Tenth Circuit found the law was *not* clearly established in *Cox* and granted qualified immunity – again rendering the decision of little value to the current case. *Id*.

The Tenth Circuit in *Cox* went on to analyze potential liability for a jail suicide, stating in *general* terms that liability may be established if a defendant has "actual knowledge…of an individual inmate's substantial risk of suicide." *Id*. at 1249. But beyond that general statement of law, *Cox* fails to provide any greater clarity with respect to the particular facts of this case. In *Cox*, the Court focused on the intake staff's failure to offer more immediate mental health treatment in light of

the inmate's responses to certain screening questions, including the fact that he had a previous diagnosis of paranoid schizophrenia and indicated he was nervous or depressed and was hearing voices. *Id*. at 1237. Those facts bear no similarity to what Captain Wilson encountered when Mr. Maes was placed in a cell in November 2019 – nor did the district court attempt to compare the two factually. And even if a factual similarity could be established, the Tenth Circuit again held there was *not* a constitutional violation "under the law that was clearly established at the time of [the inmate's] death." *Id.* at 1254. If anything, *Cox* muddies the waters on what specific information a deputy must possess in order to be liable for ignoring a "substantial risk" of suicide.

The final, and primary, case cited in the district court's order was *Elliott v. Cheshire County*, a 1991 case out of the Court of Appeals for the First Circuit. 940 F.2d 7 (1st Cir. 1991). Before even addressing the merits of *Elliott* and its application to this case, a single circuit court opinion from 1991 cannot establish a consensus of circuits necessary to show the law was clearly established even in the absence of a controlling Tenth Circuit opinion. As the Tenth Circuit recently held in *Irizarry v. Yehia*, it takes upwards of six different circuit opinions to find a "consensus" among other federal courts. 38 F.4th 1282, 1294 (10th Cir. 2022) ("the weight of authority from other circuits may clearly establish the law when at

least six other circuits have recognized the right at issue.").[4] One case, no matter how factually and legally persuasive, cannot carry a plaintiff across the line in the absence of binding Tenth Circuit precedent.

In any event, the facts in *Elliott* are again too dissimilar to have put Captain Wilson on notice that his own conduct violated clearly established law. Unlike in the present case, the inmate in *Elliott* had a pre-existing mental health diagnosis of schizophrenia. *Elliott*, 940 F.2d at 9. Furthermore, over his multi-night stay (in and of itself a distinguishing fact based on Mr. Maes' less than hour-long presence), the inmate made multiple statements consistent with suicidal ideation, including inquiries of other inmates about what would happen if he consumed a number of different items in his cell. *Id*. He also made a direct statement to another inmate that "he wanted to end his life." *Id*. All of these statements and actions were purportedly relayed from other inmates to a specific defendant, who further observed the inmate banging his head and noted concerning irrational behavior about the water in his cell being contaminated. *Id*. at 9-10.

---

[4] While the numerical standard of six circuits appears to be relatively new in the Tenth Circuit, it has certainly always been the case that one circuit opinion was not sufficient. *See, e.g., Leiser v. Moore*, 903 F.3d 1137, 1140 (10th Cir. 2018) (requiring "a clear consensus of a significant number of fellow circuit courts."). Thus, even if the Tenth Circuit ultimately revises the number of circuit court opinions necessary to establish a consensus, it is certainly more than the one circuit opinion cited by the district court in this case.

Other than the banging of his head on a part of the cell, Mr. Maes shared essentially none of the characteristics of the inmate in *Elliott*. No one at the Jail was aware of Mr. Maes' prior mental health history or his past history of suicidal ideation. He was not present over multiple nights and Captain Wilson was not aware of multiple statements consistent with suicidal ideation. Of course, Ms. Lieberenz will point out that Mr. Maes did make a comment about "killing himself," yet as the district court correctly held, a one-off remark of suicidal ideation is insufficient to create a substantial risk of suicide. (App. Vol. III at 81) (citing *Daniels v. Glase*, 198 F.3d 257, 1999 WL 1020522, at *5 (10th Cir. 1999)). Thus, even if a thirty-year-old opinion from outside the Tenth Circuit could establish a "consensus of circuits" on the issue of deliberate indifference, *Elliott* lacks the factual similarity to be of use to the present case.

The fault in the district court's order appears to be the lack of clearly established case law demonstrating what a "substantial risk" of suicide actually is. As the district court's order makes clear, inmates can engage in a variety of behaviors, such as being intoxicated or making one-off comments about suicide, and not create a "substantial risk" of suicide such that a deputy must intervene. (App. Vol. III at 81-82). What's missing from the district court's order, however, is clearly established precedent articulating that when an inmate engages in multiple behaviors, *i.e.*, behaviors in "aggregation," that a deputy must act or be vulnerable

to constitutional liability. It is certainly not *Cox*, as the Tenth Circuit never articulated any standards giving other deputies notice that a certain combination of behavioral traits will trigger a "substantial risk" that must be acted upon.

Indeed, based on Tenth Circuit precedent, it is not clearly established how many data points a deputy must possess about possible suicidal ideation, nor the severity or timing of those characteristics or traits, before constitutional liability will attach based on a "substantial risk" of suicidal ideation. But that is exactly what the U.S. Supreme Court requires: a case that while not necessarily on all fours factually with the case at issue, nonetheless provides fair warning that a government official must act or refrain from acting in certain circumstances, lest they risk being liable in their individual capacity. In the present case, Captain Wilson did not evaluate Mr. Maes at substantial risk of suicide based on the brief interaction the two had while the former was fixing the radios. And based on a survey of Tenth Circuit precedent, there is no clearly established case law putting every reasonable detention official on notice that an inmate who is intoxicated, hits his head in his cell, and offers one comment about self-harm is at "substantial risk" of suicide. Again, the district court found all of those actions individually to be insufficient to establish constitutional liability. What's missing is a case that combines those behaviors and establishes a standard for a "substantial risk" of suicide that must be acted upon.

Under either the sliding scale or the U.S. Supreme Court approach, the district court ended its analysis of clearly established law at an unacceptably high level of generality that failed to put Captain Wilson on notice that his actions would result in liability. Therefore, the district court erred in denying his motion for summary judgment with respect to the claim against him in his individual capacity.

C.    Both Ms. Lieberenz and the district court abandoned the clearly established analysis with respect to her claim of supervisory liability.

When denying Captain Wilson summary judgment over Ms. Lieberenz's claim for supervisory liability, the district court did not conduct a separate analysis of clearly established law. Rather, the district court simply stated that "[f]or the reasons articulated above…this Court respectfully denies summary judgment as to Count Six." (App. Vol. III at 85). Presumably the "reasons articulated above" were the district court's discussion of *Crane*, *Cox*, and *Elliott*. Ms. Lieberenz's analysis of clearly established law for her supervisory liability claim was even more lacking – she did not actually address Captain Wilson's separate request for qualified immunity under this claim, nor did she cite any cases discussing clearly established law in the context of supervisory liability.[5] (App. Vol. II at 70-71). The district

---

[5] Captain Wilson did indeed demand a separate analysis of clearly established case law. (App. Vol. I at 154) ("Wilson is entitled to qualified immunity in the absence of case law demonstrating that it was clearly established that his *supervisory conduct* was unconstitutional. The Estate has failed to identify case law putting

court's failure to cite case law regarding supervisory liability in the context of

inmate suicides constitutes reversible error.

It is well established in the Tenth Circuit that precedent demonstrating

clearly established case law for individual liability does not similarly demonstrate

clearly established law for purposes of supervisory liability. Instead, the plaintiff

must demonstrate, and the district court must find, separate case law demonstrating

that a defendant's actions or omissions *as a supervisor* were in and of themselves

clearly established as unconstitutional. The Tenth Circuit summarized this

principle best in *Perry v. Durborow*, where it stated:

> Critically, just as the constitutional-violation question in this case
> didn't turn on whether Clements violated Perry's constitutional rights
> by raping her, the clearly-established-law question doesn't turn on
> whether existing precedent would have put a reasonable detention
> officer in Clements' position on notice that raping Perry would violate
> her constitutional rights. Instead, to satisfy the second part of the
> qualified-immunity test in the context of Perry's supervisory-
> liability claim against Durborow, Perry must show that as of February
> 25, 2013, "clearly established law ... would ... have put a reasonable
> official in [Durborow's] position on notice that his *supervisory
> conduct* would" violate Perry's constitutional rights. *Cox*, 800 F.3d at
> 1247 (emphasis added). In other words, Perry must "identify a case
> where an offic[ial] acting under similar circumstances as [Durborow]
> was held to have violated" the Constitution. *Pauly*, 137 S.Ct. at 552.

892 F.3d at 1123 (emphasis in original).

---

Wilson on notice that his *supervisory actions* with respect to the Maes' incident
were constitutionally insufficient.") (emphasis added).

In light of *Perry*, it requires relatively little analysis to demonstrate the folly of Ms. Lieberenz's argument. Ms. Lieberenz's supervisory liability claim is premised on her assertions that: (1) the Jail's operating procedures, which Captain Wilson oversees, were inadequate to monitor potentially suicidal inmates, (2) that Captain Wilson relied on deputies and dispatchers who lacked sufficient training on "suicide issues," and (3) Captain Wilson left the Jail that evening with Defendant Macias as the deputy on duty, who allegedly lacked training to perform his role adequately. (App. Vol. II at 70-71). But beyond making those factual averments, Ms. Lieberenz never cited a Tenth Circuit or U.S. Supreme Court case demonstrating that the type or intensity of training and supervision Captain Wilson employed at the Jail was constitutionally deficient.

Even if this Court were to consider *Crane*, *Cox*, and *Elliott*, as the district court apparently did, in none of the three cases did the courts issue guidelines or standards regarding the necessary training and supervision of deputies by a commanding officer in the context of jail suicides. Thus, none of the three cases provide "fair notice" to Captain Wilson that the Jail's training program and his supervision of deputies was constitutionally inadequate. In the absence of such showing, Captain Wilson is entitled to summary judgment as a matter of law over Ms. Lieberenz's claim of supervisory liability.

## CONCLUSION

For the reasons set forth herein, the district court's order should be reversed, in part, and the two claims against Captain Wilson in his individual capacity should be dismissed on grounds of qualified immunity.

## STATEMENT AS TO ORAL ARGUMENT

Captain Wilson submits that portions of the qualified immunity analysis offered herein would likely not materially benefit from oral argument.

However, retirement of the sliding scale may benefit from oral argument given its fifteen-year existence in the Tenth Circuit. Captain Wilson would welcome argument on this point of law and believes it may assist the Court in deciding whether the sliding scale remains viable in qualified immunity jurisprudence.

s/*Nicholas C. Poppe*
Marni Nathan Kloster
Nicholas C. Poppe
Nathan Dumm & Mayer P.C.
7900 East Union Avenue, Suite 600
Denver, Colorado 80237
Tel: (303) 691-3737
FAX: (303) 757-5106
npoppe@ndm-law.com
*Attorneys for Kenneth Wilson*

50

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.     This brief complies with the page limitation of Fed. R. App. P. 32(a)(7)(A) because:

   [**x**] it has 10,695 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii), or

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [**x**] this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in font 14, Times New Roman.

Date: June 20, 2023

                              *s/Nicholas C. Poppe*
                              Nicholas C. Poppe
                              Attorney for Kenneth Wilson
                              Nathan Dumm & Mayer P.C.
                              7900 E. Union Avenue, Suite 600
                              Denver, CO 80237
                              Tel: (303) 691-3737
                              FAX: (303) 757-5106
                              npoppe@ndm-law.com

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, TrendMicro Worry Free Business Security Agent version 7.0.1638 and Sonicwall Gateway Antivirus, and according to those programs are free of viruses.


*s/Nicholas C. Poppe*
Nicholas C. Poppe

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed the foregoing **KENNETH WILSON'S OPENING BRIEF** using the court's CM/ECF system which will send notification of such filing to the following and hand delivered seven (7) hard copies to the court within five (5) business days:

Sean M. Dormer, Esq.
Timothy Garvey, Esq.
Dormer Harping
3457 Ringsby Court, Unit 110
Denver, CO 80216
(303) 756-3812
smd@denvertrial.com
tmg@denvertrial.com

John S. Bryan, Esq.
Bryan & Terrill Law
333 West Hampden, Suite 420B
(720) 923-2333
jsbryan@bryanterrill.com
*Attorneys for Plaintiff-Appellee/Cross-Appellant*

James D. Murdock, II, Esq.
John T. Osgood, Esq.
Taylor Anderson
1670 Broadway, Suite 900
Denver, CO 80202
(303) 551-6660
jmurdock@talawfirm.com
josgood@talawfirm.com
*Attorneys for Defendant-Appellant/Cross-Appellant*
*Wilson and Defendants/Cross-Appellants BOCC*

Leslie L. Schluter
Sophia A. N. Fernald
8400 E. Prentice, Suite 1401
Greenwood Village, CO 80111
(303) 221-4661
lschluter@lawincolorado.com

sfernald@lawincolorado.com
*Attorneys for Defendant/Cross-Appellee Wells*

*s/Nick Poppe*

Marni Nathan Kloster
Nicholas C. Poppe
Attorney for Defendants/Appellees
Nathan Dumm & Mayer P.C.
7900 E. Union Avenue, Suite 600
Denver, CO 80237
Tel: (303) 691-3737
mkloster@ndm-law.com
npoppe@ndm-law.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Nina Y. Wang

Civil Action No. 21-cv-00628-NYW-NRN

SARAH LIEBERENZ, Individually and as Personal Representative of THE ESTATE OF JACKSON MAES, deceased,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY
OF SAGUACHE, COLORADO, in its official capacity,
SAGUACHE COUNTY SHERIFF'S OFFICE, a governmental entity,
DAN WARWICK, SHERIFF OF SAGUACHE COUNTY, in his official capacity,
KENNETH WILSON, in his individual capacity,
ELKE WELLS, in her individual capacity,
MIGUEL MACIAS, in his individual capacity, and
SHELBY SHIELDS, in her individual capacity,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Pending before the Court are four motions.  First, the Board of County Commissioners (the "Board"), the Saguache County Sheriff's Office (the "Sheriff's Office"), Sheriff Dan Warwick ("Defendant Warwick" or "Sheriff Warwick"), Kenneth Wilson ("Defendant Wilson"), and Shelby Shields ("Defendant Shields," and, collectively, the "County Defendants") filed a Motion for Partial Summary Judgment ("County Defendants' Motion"), [Doc. 102, filed June 30, 2022], on the claims alleged against them.  Plaintiff Sarah Lieberenz, in her capacity as personal representative of the Estate of Jackson Maes ("Plaintiff" or "the Estate")[1] filed a Response in

---

[1] Although the briefing associated with the instant Motions for Summary Judgment originally referred to "Plaintiffs," the Court refers to Ms. Lieberenz only in her capacity as personal representative of the Estate because of its ruling on Defendant Miguel Macias's Motion for Partial Summary Judgment and its Order to Show Cause that dismissed claims brought pursuant to 42

opposition to the County Defendants' Motion, [Doc. 124, filed August 11, 2022], and the County

Defendants followed with a Reply, [Doc. 142, filed August 25, 2022].  Second, Defendant Elke

Wells ("Defendant Wells") filed a Motion for Summary Judgment ("Defendant Wells's Motion"),

[Doc. 104, filed June 30, 2022].  Plaintiff filed a Response in opposition to Defendant Wells's

Motion, [Doc. 113, filed August 4, 2022], and Defendant Wells subsequently filed a Reply, [Doc.

150, filed September 8, 2022].  Third, Plaintiff filed a "Motion to Supplement Responses to

Motions for Summary Judgment re: Issue of First Impression on Language Improperly Omitted

from 42 U.S.C. § 1983" ("Motion to Supplement Responses").  [Doc. 149, filed September 7,

2022].  The County Defendants filed a Response in opposition, [Doc. 159, filed September 28,

2022], and Plaintiff filed a Reply, [Doc. 175, filed October 21, 2022].  Fourth and finally, Plaintiff

filed an "Opposed Motion to Strike or Alternatively Motion to File a Surreply" ("Motion to

Strike").  [Doc. 169, filed October 14, 2022].  The County Defendants filed a Response, [Doc.

176, filed November 4, 2022], and Plaintiff filed a Reply, [Doc. 182, filed November 11, 2022].

The issues have thus been fully briefed and are ripe for resolution.  Upon consideration of

the briefing and the entire record, the Court concludes that oral argument will not materially assist

in the resolution of the Motions.  For the reasons set forth below, the Court **GRANTS IN PART**

and **DENIES IN PART** the County Defendants' Motion for Partial Summary Judgment,

---

U.S.C. § 1983 by Ms. Lieberenz in her individual capacity against all Defendants, leaving only
claims brought by the Estate pursuant to § 1983.  [Doc. 187 at 13].  As discussed in that
Memorandum Opinion and Order, the United States Court of Appeals for the Tenth Circuit has
foreclosed wrongful death claims under § 1983.  [Doc. 187].  *See Berry v. City of Muskogee*, 900
F.2d 1489, 1506–07 (10th Cir. 1990) (reasoning that the remedy for § 1983 disputes resulting from
an individual's death "should be a survival action, brought by the estate of the deceased victim, in
accord with § 1983's express statement that the liability is to the party injured." (internal quotations
omitted)).  As such, references to Plaintiff's constitutional injuries relate to those suffered by Mr.
Maes, not to any particular harm suffered by Ms. Lieberenz in her individual capacity.

**GRANTS** Defendant Wells's Motion for Summary Judgment, **DENIES** Plaintiff's Motion to Supplement Responses, and **DENIES** Plaintiff's Motion to Strike.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the record in this case and are undisputed for the purposes of summary judgment, unless otherwise noted.  In addition to those materials cited by the Parties—and consistent with Rule 56(c)(3) of the Federal Rules of Civil Procedure—the Court considers "other materials in the record" where appropriate.  Fed. R. Civ. P. 56(c)(3).

### A.    The Saguache County Jail

The Saguache County Jail ("SCJ") is a detention facility comprised of four cells and one holding "tank" that is designed to house inmates who have been placed on suicide watch and those who are intoxicated or are displaying behavioral problems.  [Doc. 102 at ¶ 2; Doc. 124 at 1].  The SCJ is staffed by two individuals during "normal" hours—one jailer and one dispatcher.[2]  [Doc. 102 at ¶ 3; Doc. 124 at 2, ¶ 3].  The dispatcher's responsibilities include "handling phone calls, coordinating responses for road deputies, and entering information into the County's computer-aided dispatch system."  [Doc. 102 at ¶ 4; Doc. 124 at 1].  The jailer's responsibilities include "monitoring the inmates and conducting physical checks of the cells every hour."  [Doc. 102 at ¶ 6; Doc. 124 at 2, ¶ 6].  Occasionally, a single jailer/dispatcher model will be employed on the overnight shift—from midnight to 8:00 a.m.—wherein a single individual acts as both jailer and dispatcher.[3]  [Doc. 102 at ¶ 8].

---

[2] Plaintiff disputes that there is a dedicated "dispatcher" position, instead arguing that the dispatcher is responsible for acting as both a dispatcher and a jailer even when a dedicated jailer is present at the SCJ.  [Doc. 124 at 2, ¶ 3].

[3] Plaintiff disputes this fact, admitting that "Defendant[s] used a jailer/dispatcher post, but disput[ing] it was exclusive to the overnight shift."  [Doc. 124 at 3, ¶ 8].  Respectfully, Plaintiff's

3

A suicide prevention policy is in force at the SCJ, and requires that potentially suicidal inmates be housed in the "tank," with nothing but a suicide suit and a mattress. [Doc. 102 at ¶ 37; Doc. 124 at 1]. The policy also requires jailers to conduct ten-minute camera checks and twenty-minute in-person checks on suicidal inmates. [Doc. 102 at ¶ 38; Doc. 124 at 1]. Jail employees receive "a mandatory fourteen-week on-the-job training program while working at the Jail, which includes training on potentially suicidal parties."[4] [Doc. 102 at ¶ 40].

Since 1995, two other suicides have occurred at the SCJ. [Doc. 102 at ¶ 41; Doc. 124 at 1]. In 2013, another inmate—William Starkey ("Mr. Starkey")—"committed suicide by hanging his pants and a white sheet over an electrical conduit pipe in Cell Four of the SCJ." [Doc. 102 at ¶ 42; Doc. 124 at 1]. He had been incarcerated for four months prior to his suicide. [Doc. 102 at ¶ 43; Doc. 124 at 1]. Earlier, in 2008, an inmate named Felix Granados ("Mr. Granados") committed suicide in Cell One using the privacy curtain. [Doc. 102 at ¶ 44; Doc. 124 at 1]. Prior to his death, Mr. Granados was evaluated by a mental health agency and was cleared for a return to the SCJ. [Doc. 102 at ¶ 45; Doc. 124 at 6, ¶ 45].

### B.    Arrest and Detention of Mr. Maes

The instant case arises out of the arrest of Mr. Jackson Maes ("Mr. Maes") on November 16, 2019 by Defendant Wells, a Saguache County Sheriff's Deputy, after receiving a report of an intoxicated individual from a concerned citizen. [Doc. 102 at ¶ 9; Doc. 104 at ¶ 1; Doc. 113 at 1, ¶ 1; Doc. 124 at 1]. Defendant Wells located Mr. Maes outside the Ute Theater in the Town of Saguache. [Doc. 104 at ¶¶ 3, 6; Doc. 113 at 1–2, ¶¶ 3, 6]. He was losing his balance and smelled

---

"dispute" does not speak to whether a *single* jailer/dispatcher model was employed outside the overnight shift, and so the Court treats this fact as undisputed.

[4] Plaintiff disputes that Defendant Shields received training on intoxicated suicidal inmates before Mr. Maes's death. [Doc. 124 at 6, ¶ 40].

strongly of alcohol.  [Doc. 104 at ¶ 7; Doc. 113 at 2, ¶ 7].  His arrest was predicated upon a warrant for a failure to appear on a traffic offense.  [Doc. 104 at ¶ 11; Doc. 113 at ¶ 11].  Defendant Wells subsequently transported Mr. Maes to the SCJ.  [Doc. 102 at ¶ 14; Doc. 124 at 1].

On the evening of November 16, 2019, Defendant Shields was working as the dispatcher on duty at the SCJ.  [Doc. 102 at ¶ 10; Doc. 124 at 1].  At the time, she had been employed by Saguache County for two months.  [Doc. 102 at ¶ 11; Doc. 124 at 1].  Defendant Miguel Macias ("Defendant Macias") was on duty as the jailer on the evening of Mr. Maes's arrest.[5]  [Doc. 102 at ¶ 12; Doc. 124 at 1].  Defendant Wilson was also present at the SCJ on the evening of November 16, 2019, at least in part, in an effort to fix the dispatcher's broken radio console.  [Doc. 102 at ¶ 13; Doc. 124 at 3, ¶ 13].

Upon Mr. Maes's arrival at the SCJ, Defendant Shields observed that he appeared intoxicated and high.  [Doc. 102 at ¶ 14; Doc. 124 at 1].  He was placed in Cell One, which was empty, because the "tank" was occupied by an inmate with behavioral problems.  [Doc. 102 at ¶¶ 16–17; Doc. 124 at 1].  But for the other inmate, Mr. Maes would have been placed in the tank.  [Doc. 102 at ¶ 16; Doc. 124 at 1].  Defendants Wells, Wilson, and Macias assisted Mr. Maes into his jail uniform, and placed him into Cell One.  [Doc. 102 at ¶ 18; Doc. 124 at 4, ¶ 18].

Around twelve minutes after he was placed in Cell One, Mr. Maes "began making loud noises by banging into a metal wall in the cell."  [Doc. 102 at ¶ 19; Doc. 124 at 1].  Defendants Wilson and Macias re-entered the area around the cell, with Defendant Wells following.  [Doc. 102 at ¶ 21; Doc. 124 at 1].  Defendant Wells advised Mr. Maes to lie down and "get some rest."

---

[5] Approximately ten days before Mr. Maes's arrival at the SCJ, Defendant Macias submitted a letter of resignation to Defendants Kenneth Wilson and Dan Warwick.  [Doc. 102 at ¶ 46; Doc. 124 at 1].  *Inter alia*, Defendant Macias indicated that he was resigning because of "his perception of having little or no training on certain aspects of his job."  [Doc. 102 at ¶ 47; Doc. 124 at 1].

[*Id.*].  In response, Mr. Maes said "I'm trying to kill myself right now."  [Doc. 102 at ¶ 22; Doc. 124 at 4, ¶ 22].  Defendant Wilson replied by asking "You're trying to kill yourself right now?" [Doc. 102 at ¶ 23; Doc. 124 at 4, ¶ 23].  Receiving no response, Defendant Wilson subsequently left the area around Cell One.  [Doc. 102 at ¶ 25; Doc. 124 at 4, ¶ 25].

Defendant Shields remained at the dispatcher station during these events.  [Doc. 102 at ¶ 26; Doc. 124 at ¶ 26].  At some point, she placed a call to an outside vendor to obtain care for Mr. Maes; she does not recall the impetus for doing so, or whether she attempted "to contact mental health or the detox facility used by the Jail."[6]  [Doc. 102 at ¶¶ 29–30; Doc. 124 at 5, ¶¶ 29–30].  Because her radio was not functioning, Defendant Shields recalled the evening being "hectic." [Doc. 102 at ¶ 31; Doc. 124 at 1].  In addition to doing "everything manually," she was engaged in a conversation with Defendant Wells about protocols for road deputies.  [Doc. 102 at ¶¶ 31–32; Doc. 124 at 1].

Meanwhile, Defendant Macias engaged in several conversations with Mr. Maes.  [Doc. 102 at ¶ 33; Doc. 124 at 1].  The two "discussed how to bond out of jail, whether [Mr. Maes] could obtain food (which [Defendant] Macias provided), and whether he could make calls the following day."  [*Id.*].  Fourteen minutes after the end of their conversation—at approximately 10:22 p.m.— Mr. Maes committed suicide using the privacy curtain in his cell.  [Doc. 102 at ¶ 34; Doc. 124 at 5, ¶ 34].  The independent coroner who examined Mr. Maes following his death concluded that he died "within approximately three minutes."[7]  [Doc. 102 at ¶ 35].  Around one hour and thirty-eight

---

[6] The record shows that Defendant Shields called San Luis Valley Behavioral Health.  [Doc. 128-3 at 22:03:04, 22:03:52; Doc. 126 at 3; Doc. 128-7 at 188:23–25; Doc. 128-8 at 48:17–49:4]; *see* Fed. R. Civ. P. 56(c)(3).  She testified that she did not leave a message.  [Doc. 128-8 at 58:6–15].  As noted in the Court's ruling on Plaintiff's Motion for Sanctions, there is no evidence in the record that Defendant Shields did leave a message.  [Doc. 200 at 12–13].

[7] Plaintiff disputes this fact as overly vague, noting that it does not identify when the "three minutes" began.  [Doc. 124 at 5, ¶ 35].  While true that the purportedly undisputed fact does not

minutes after Mr. Maes's death—at midnight—Defendants Macias and Shields were relieved from their shifts.  [Doc. 102 at ¶ 36; Doc. 124 at 5, ¶ 36].

## II.    Procedural Background

Ms. Lieberenz brought suit in her individual capacity and as a personal representative on behalf of Mr. Maes's Estate against the Board of County Commissioners of Saguache, Colorado (the "Board"), the Saguache County Sherriff's Office (the "SCSO" or "Sheriff's Office"), Sheriff Warwick, Defendant Wilson, Defendant Wells, Defendant Macias, and Defendant Shields on March 3, 2021.  [Doc. 1 at 1].  She raised eleven claims:

1. Inadequate Physical Plant – Conditions of Confinement (42 U.S.C. § 1983); raised against the Board.  [*Id.* at ¶¶ 167–72].

2. Inadequate Funding – Conditions of Confinement (42 U.S.C. § 1983); raised against the Board.  [*Id.* at ¶¶ 173–77].

3. Inadequate Supervision – Policy or Practice (42 U.S.C. § 1983); raised against Sheriff Warwick in his official capacity.  [*Id.* at ¶¶ 178–82].

4. Inadequate Training – Policy or Practice (42 U.S.C. § 1983); raised against Sheriff Warwick in his official capacity.  [*Id.* at ¶¶ 183–188].

5. Inadequate Staffing – Policy or Practice (42 U.S.C. § 1983); raised against Sheriff Warwick in his official capacity.  [*Id.* at ¶¶ 189–193].

---

reference a beginning point for the three-minute clock suggested by the coroner, Defendants cite to a portion of his deposition in which he testified that death would have occurred within three minutes after Mr. Maes's body stopped moving.  *See* [Doc. 102-7 at 99:4–24].  And in any event, Plaintiff avers that "[w]hile jail staff socialized in the dispatch room, [Mr. Maes] succumbed to his illness and perished around 10:30 p.m."  [Doc. 1 at ¶ 2].  Therefore, any dispute is not material for the purposes of the instant Motions for Summary Judgment.

6. Supervisory Liability (42 U.S.C. § 1983); raised against Defendant Wilson in his individual capacity. [*Id.* at ¶¶ 194–95].

7. Individual Liability (42 U.S.C. § 1983); raised against Defendant Wilson in his individual capacity. [*Id.* at ¶¶ 196–97].

8. Individual Liability (42 U.S.C. § 1983); raised against Defendant Macias in his individual capacity. [*Id.* at ¶¶ 198–99].

9. Individual Liability (42 U.S.C. § 1983); raised against Defendant Wells in her individual capacity. [*Id.* at ¶¶ 200–01].

10. Individual Liability (42 U.S.C. § 1983); raised against Defendant Shields in her individual capacity. [*Id.* at ¶¶ 202–03].

11. Negligent Supervision of a Jail (C.R.S. § 24-10-106(1)(b)); raised against the Board, the SCSO, and Sheriff Warwick. [*Id.* at ¶¶ 204–208].

On April 21, 2021, this action was assigned to Judge William J. Martínez. [Doc. 37]. On July 29, 2022, the case was reassigned to this Court following Judge Martínez's recusal. [Doc. 110]. Defendant Macias moved to dismiss the individual capacity claims against him, arguing that Ms. Lieberenz was not a proper party to rise claims under § 1983, and that damages should be limited to certain categories. *See* [Doc. 101]. The County Defendants and Defendant Wells joined Mr. Macias's motion. *See* [Doc. 103; Doc. 105]. On November 30, 2022, the Court entered a Memorandum Opinion and Order addressing Defendant Macias' Motion for Partial Summary Judgment. *See* [Doc. 187]. In relevant part, the Court determined that summary judgment in Defendants' favor was warranted on Counts One through Ten with respect to any claims or damages alleged by Ms. Lieberenz as an individual. [*Id.* at 13]. Those claims therefore survive only as raised by the Estate. The Court also directed Plaintiff to show cause as to why Ms.

Lieberenz, as an individual, should not be dismissed as a party to the action, which prompted Plaintiff to move to amend her Complaint to include a claim for wrongful death—a request that is opposed and still pending. [Doc. 188; Doc. 191].

With this factual and procedural background in mind, the Court turns to a consideration of the legal standards that will guide the resolution of the pending motions.

## LEGAL STANDARD

The Court may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put differently, the Court's function at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Of course, the bar on weighing evidence does not absolve a nonmoving party from the need to offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *Anderson*, 477 U.S. at 256. Such a showing must consist of more than a "scintilla of evidence." *Id.* at 252. That is, conclusory statements based on speculation, conjecture, or subjective belief are insufficient to survive summary judgment. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Whether a fact is "material" depends on whether it pertains to an element of a claim or a defense; a dispute is "genuine" if the evidence is so contradictory that a reasonable jury could return a verdict for either party. *See Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

9

(citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  In reviewing a motion for summary judgment, this Court views all evidence in the light most favorable to the non-moving party.  *See, e.g.*, *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).  That said, the Court is not required to—and will not—make unreasonable inferences in favor of that party.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008).  It is this legal framework that will govern the Court's consideration of Defendant's Motion.

**ANALYSIS**

Taken together, the County Defendants and Defendant Wells move for summary judgment on all but two counts: Count Eight, which is raised against another defendant, Miguel Macias, in his individual capacity, and Count Eleven, which is raised under a state law concerning the negligent operation of a jail against Sheriff Warwick, the Saguache County Sheriff's Office, and the Board of County Commissioners.  Both counts therefore remain pending, subject to limitations outlined in this Court's prior orders.  *E.g.* [Doc. 187].

The Court begins by discussing what materials it considers in resolving the instant motions and turns to the pending Motion to Strike.  [Doc. 169].  The Court then considers whether the doctrine of qualified immunity bars certain claims against Defendants Wilson, Shields, and Wells raised in their individual capacities, and for Defendant Wilson in his supervisory capacity.  Given the centrality of Plaintiff's Motion to Supplement Responses to the qualified immunity analysis, the Court concurrently addresses the issues raised therein.  Following this discussion, the Court will address the propriety of summary judgment with respect to the remaining claims.

I.      **Motion to Strike**

Plaintiff's Motion to Strike is aimed at the County Defendants' Reply to their Motion for Partial Summary Judgment. [Doc. 142]  Plaintiff contends that the County Defendants use their

10

64

Reply to newly assert that "(1) the jail was 'fully staffed' [ ]; (2) the jail was under capacity, and therefore not 'overcrowded' [ ]; (3) that [the Prison Rape Elimination Act] compelled them to leave a privacy curtain in Cell 1 [ ]; (4) that the Complaint conclusively established when the clock began on [Mr. Maes's] death[ ]; and (5) that actual knowledge, and not constructive notice, is the standard for *Monell* liability." [Doc. 169 at 2 (citations omitted)]. The Estate also argues that "Defendants also included new arguments about cumulative impact and the highly predictable/plainly obvious path to *Monell* liability that do not appear in their partial motion." [*Id.*]. Plaintiff seeks to have the entire Reply stricken, or the opportunity to file a sur-reply. [*Id.*].

Typically, "arguments raised for the first time in a reply brief are generally deemed waived," *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011), and district courts within this Circuit have granted motions to strike such newly raised arguments, *see Sarl v. Sprint Nextel Corp.*, No. CIV.A. 09-2269-CM, 2011 WL 346083, at *3 n.2 (D. Kan. Feb. 2, 2011) (collecting cases "stri[king] exhibits and arguments from . . . reply brief[s] when the exhibits and discussion were raised for the first time in a reply brief"). If not stricken, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has instructed that "[g]enerally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply." *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). In any event, the Court retains the discretion to consider portions of a reply while disregarding others. *Cf. Becher v. United Healthcare Servs., Inc.*, 374 F. Supp. 3d 1102, 1107–08 (D. Kan. 2019) (declining to strike defendants' reply to their motion to dismiss in favor of exercising the court's discretion to disregard matters outside the pleadings and arguments making reference thereto).

The Court is mindful that the consideration of issues raised for the first time in a reply brief "robs the [other party] of the opportunity to demonstrate that the record does not support [the

moving party's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result." *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). But in order to justify striking the County Defendants' Reply or authorizing a sur-reply, the Court must satisfy itself that the challenged arguments are truly "new"—that is, not raised in the County Defendants' Motion for Partial Summary Judgment or in response to Plaintiff's opposition brief. *See Home Design Servs., Inc. v. B & B Custom Homes, LLC*, 509 F. Supp. 2d 968, 971 (D. Colo. 2007) ("[R]eply briefs reply to arguments made in the response brief."); *United States v. Ridley's Fam. Markets, Inc.*, No. 1:20-cv-173-TS-JCB, 2021 WL 2141740, at *1 (D. Utah May 26, 2021) (denying motion to strike where arguments made in reply were not new, but merely responded to the opposition to the motion).

That inquiry proves fatal to Plaintiff's Motion to Strike. First, Plaintiff argues that the County Defendants never contended that the SCJ was "fully staffed" on the night of Mr. Maes's death. [Doc. 169 at 2]. But in their Motion for Partial Summary Judgment, the County Defendants expressly argued that "at the time of [Mr. Maes's] suicide, the County employed both a dispatcher and a jailer," and that Plaintiff had failed to demonstrate that more staff members were constitutionally necessary. [Doc. 102 at 11, 18–19]. The County Defendants need not use the phrase "fully staffed" verbatim in order to communicate its clear implication: that both a jailer and dispatcher were present at the time of Mr. Maes's death, and that this level of staffing was constitutionally adequate.

Second, Plaintiff claims that the County Defendants only raise the fact that the jail was under capacity—and therefore not overcrowded—in their Reply. [Doc. 169 at 2]. But it is Plaintiff—not the County Defendants—who first raised the issue of the SCJ's capacity in her Response. [Doc. 124 at 7, ¶ 5 ("The sheriff said his office was 'extremely overwhelmed and very

understaffed,' [and] that the jail is at capacity.")].  The County Defendants were well within their rights to respond to allegations of overcrowding with evidence that the SCJ was, in fact, under capacity on the night of Mr. Maes's death.  [Doc. 142 at 1, ¶ 1; *id.* at 3, ¶¶ 5–6].

Third, Plaintiff contends that the County Defendants' argument that the Prison Rape Elimination Act ("PREA") required the presence of a privacy curtain in Cell One was novel.  [Doc. 169 at 2].  In the Response, Plaintiff avers that "[a]fter the Granados suicide, [the SCJ] continued housing suicidal inmates in Cell [One] without making any changes, and without any effort to suicide-proof the cell, which could be done by removing the privacy curtain and using plexiglass to block access to the exposed bars."  [Doc. 124 at 10, ¶ 26].  In their Reply, the County Defendants respond to this undisputed fact by stating: "Admitted that the County had a privacy curtain in front of the toilet, per the Prison Rape Elimination Act."  [Doc. 142 at 5, ¶ 26].  This is the sole mention of the PREA in any briefing, and the Court does not believe that it warrants further discussion.  To the extent that Plaintiff is concerned that the Court draws an inference with respect to the need for or propriety of the privacy curtain based on PREA, it does not; indeed, the County Defendants make no such argument.  *See generally* [Doc. 102; Doc. 142].  Striking the Reply, or even this portion of the Reply, thus is unnecessary, as the only conclusion the Court draws from this fact is that it is undisputed that a privacy curtain was situated around the toilet in Cell One.  *See White v. Deere & Co.*, No. 13-cv-02173-PAB-NYW, 2015 WL 5081609, at *7 n.6 (D. Colo. Aug. 28, 2015) (declining to strike argument and evidence in reply because "even considering the Reply, the only conclusion that the court [drew]" was more limited than what the new argument and evidence suggested).

Fourth, Plaintiff challenges the County Defendants' argument that the Complaint "conclusively" establishes "when the clock began" on Mr. Maes's death.  [Doc. 169 at 2].  Plaintiff

13

appears to take issue with the County Defendants' position that they "cannot dispute their own Complaint," in this case with reference to paragraph 132 of the Complaint. *See* [Doc. 142 at 2, ¶¶ 34–36; *id.* at 6, ¶¶ 41–42; Doc. 1 at ¶ 132].  In full, paragraph 132 alleges that "[t]he video clearly depicts Jackson hanging in his cell for almost two full minutes before expiration of any purported 15-minute window to perform a suicide check." [Doc. 1 at ¶ 132].  All of this relates to what the County Defendants accurately characterize as a new theory presented by Plaintiff in her Response: that, despite hanging himself at approximately 10:22 p.m., Mr. Maes might still have been alive during the shift change that occurred at midnight. *Compare* [Doc. 124 at 25] *with* [Doc. 1 at ¶¶ 2 (alleging Mr. Maes "succumbed to his illness and perished around 10:30 p.m."), 132 (alleging Mr. Maes was on video hanging for "almost two full minutes")].  But it appears to the Court that the County Defendants properly followed the maxim that "reply briefs reply to arguments made in the response brief." *Home Design Servs., Inc.*, 509 F. Supp. 2d at 971.

Fifth, Plaintiff attacks the County Defendants' argument that actual knowledge—rather than constructive notice—"is the standard for *Monell* liability." [Doc. 169 at 2].  However, "actual knowledge" appears nowhere in the County Defendants' Reply, whether in connection with *Monell* liability or otherwise. *See generally* [Doc. 142].  The same is true for "constructive notice." [*Id.*].  Regardless, this Court is charged with determining the appropriate standard to apply to the instant Motions, and thus, it follows that striking this argument would be inappropriate, because it does not seem to appear in the Reply.

Sixth and finally, Plaintiff argues that the County "Defendants also included new arguments about cumulative impact and the highly predictable/plainly obvious path to *Monell* liability that do not appear in their partial motion." [Doc. 169 at 2].  As an initial matter, as posited, it is difficult to determine which specific portions of the Reply that Plaintiff is challenging.  The

14

Court notes that the Reply contains no mention of "cumulative impact," and only references the "highly predictable or plainly obvious" standard for municipal liability under § 1983 twice. [Doc. 142 at 7 (noting that Plaintiff "claim[s] that [the County Defendants] missed an argument that the risk of suicide is a 'highly predictable or plainly obvious consequence' of utilizing a jail with bars and privacy curtains," but failed to cite any precedent demonstrating as much), 9 (noting that Plaintiff provided "no explanation on [sic] how it was 'plainly obvious' that the County's training program was deficient")]. These are not new arguments, but rather attempts to focus the Court's attention on perceived shortcomings in Plaintiff's Response.

In sum: each of the allegedly new arguments and facts that Plaintiff references in the Motion to Strike are either mentioned in the County Defendants' Motion for Partial Summary Judgment or are provided in direct response to Plaintiff's opposition brief. The Motion to Strike is accordingly **DENIED**.

## II.    Qualified Immunity

The County Defendants' and Defendant Wells's arguments in favor of partial summary judgment on Counts Six, Seven, Nine, and Ten each invoke the doctrine of qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Counts Six and Seven are both raised against Defendant Wilson in his individual capacity, though Count Six is styled as one for "supervisory liability" and Count Seven is styled as one for "individual liability." [Doc. 1 at 33]. In Count Six, Plaintiff alleges that Defendant Wilson "failed to provide adequate supervision over the SCJ with deliberate indifference to the consequences," [*id.* at ¶ 195], while in Count Seven she claims that he

15

"exhibited deliberate indifference to the welfare of [Mr. Maes] despite actual knowledge that [Mr. Maes] had communicated suicidal ideation at the SCJ while appreciating that [Mr. Maes] was extremely intoxicated," [*id.* at ¶ 197]. Count Nine is raised against Defendant Wells in her individual capacity, and mirrors Count Seven in alleging that she "exhibited deliberate indifference to the welfare of [Mr. Maes] despite actual knowledge that [Mr. Maes] had communicated suicidal ideation at the SCJ while appreciating that [Mr. Maes] was extremely intoxicated." [*Id.* at ¶ 201]. Finally, Count Ten is raised against Defendant Shields and also alleges that she "exhibited deliberate indifference to the welfare of [Mr. Maes] despite actual knowledge that [Mr. Maes] had communicated suicidal ideation at the SCJ while appreciating that [Mr. Maes] was extremely intoxicated." [*Id.* at ¶ 203].

As noted, qualified immunity functions to protect government officials performing discretionary actions and acts as a "shield from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Once a defense of qualified immunity is asserted, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). Courts may address the prongs in either order. *Pearson*, 555 U.S. at 236.

While Plaintiff uses nearly identical language in her Complaint to make out § 1983 claims against Defendants Wilson, Wells, and Shields in their respective individual capacities, the record demonstrates that each defendant played a different role at the SCJ before and during Mr. Maes's

death.  While the doctrine of qualified immunity shields "*all* public officials except those who are plainly incompetent or those who knowingly violate the law," *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (emphasis added), such immunity attaches to each *individual's* conduct, *e.g.*, *Crane v. Utah Dep't of Corrs.*, 15 F.4th 1296, 1308 (10th Cir. 2021) (citing *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000) (noting that two of three officers acted with deliberate indifference in the wake of a prisoner's suicide based upon their prior knowledge of a suicide)); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.").

Before turning to the specific allegations, however, the Court will address Plaintiff's Motion to Supplement Responses.  Following that discussion, the Court will determine whether Defendants Wilson, Wells, or Shields, respectively, are entitled to qualified immunity.[8]

### A.    Motion to Supplement Responses

On September 7, 2022, Plaintiff filed a motion to supplement her responses to the County Defendants' and Defendant Wells's summary judgment motions.  [Doc. 149].  Plaintiff claims that she recently "learned that the author of a forthcoming law review article has determined that important text from the 1871 Civil Rights Act was improperly omitted from 42 U.S.C. § 1983"— language that, Plaintiff contends, would reject qualified immunity as a defense to § 1983 claims.[9]

---

[8]  Defendant Macias did not invoke qualified immunity to preclude Claim Eight for individual liability brought by the Estate against him for violation of the Fourteenth Amendment.  [Doc. 101].

[9] The forthcoming article is authored by Professor Alexander A. Reinert and is entitled *Qualified Immunity's Flawed Foundation*.  At present, it is only available in draft form through the Social Science Research Network ("SSRN").  *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. ___ (forthcoming) (2022) (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4179628).

17

[*Id.* at 1].  The County Defendants oppose the Motion, noting that Plaintiff is not entitled to file a supplemental response, that the information she seeks to use to supplement her original Response has been available for approximately 150 years (and, if narrowed solely to the forthcoming article she cites, still available for nearly a week before filing the original response), and that she has already exceeded this Court's expanded page limits for the Response.  [Doc. 159 at 1–5].

As Plaintiff and the County Defendants agree, the question of whether to consider a supplemental response, such as that proposed by Plaintiff, rests within this Court's discretion. [Doc. 149 at 2; Doc. 159 at 2]; *see e.g.*, *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1227 (10th Cir. 2000) ("[T]he district court clearly has discretion to permit supplemental affidavits it finds useful for summary judgment determination.").   One consideration is whether a party exercised appropriate diligence in securing the supplemental information prior to filing his or her briefing at summary judgment.  *Ware v. Denver Health*, No. 09-cv-01103-REB-BNB, 2010 WL 2740078, at *2 (D. Colo. July 12, 2010) (denying motion to supplement response to summary judgment motion where plaintiff failed to "exercise[] appropriate diligence" in securing affidavit containing testimony that would have been available prior to filing of original response brief).

Here, Plaintiff concedes that "the basis for" her theory "was technically 'available' to Plaintiff[]" prior to filing her Response, but that "[she] can hardly be faulted for missing it."  [Doc. 149 at 3].  This statement does not persuade this Court of Plaintiff's diligence.  Indeed, it is unclear what—if any—effort Plaintiff undertook prior to filing her Responses to the pending motions for summary judgment to search for novel theories regarding the text of § 1983.  In fact, Plaintiff seems to suggest that she did not perform any research that would have led her to the forthcoming article she references, noting that "lawyers do not routinely search for or consider forthcoming law review articles when writing their briefs."  [Doc. 175 at 4].  Plaintiff's position therefore boils

18

down to a contradiction: that this article is sufficiently groundbreaking so as to alter this Court's reading of § 1983 (and contradict the reading employed by "[f]ederal courts and other litigants . . . for as long as qualified immunity defenses have been asserted"), [Doc. 149 at 3], but not so groundbreaking as to warrant additional internet research for secondary sources prior to filing the original Responses. It follows that—even assuming the forthcoming article's relevance to this matter[10]—Plaintiff's lack of diligence counsels against permitting her to supplement the responses with arguments that were previously available. Her Motion is accordingly **DENIED**.

**B.    Counts Six, Seven, Nine, and Ten**

The Court turns to a review of the four claims that implicate the doctrine of qualified immunity in this matter.

**1.    Count Seven: Defendant Wilson – Individual Liability[11]**

Count Seven is raised against Defendant Wilson in his individual capacity. Plaintiff alleges that he "exhibited deliberate indifference to the welfare of [Mr. Maes] despite actual knowledge that [Mr. Maes] had communicated suicidal ideation at the SCJ while appreciating that [Mr. Maes] was extremely intoxicated." [Doc. 1 at ¶ 197]. Specifically, Plaintiff alleges that Defendant Wilson exhibited deliberate indifference to a substantial risk of suicide for four reasons: (1) he heard Mr. Maes mention that he was attempting to kill himself once, (2) he observed Mr. Maes striking his head, (3) he believed Mr. Maes was eligible for detox, and (4) he believed "something

---

[10] This Court makes no substantive determination as to the relevance of the proffered article to its analysis. Nevertheless, Plaintiff does not cite, and this Court unaware of, any authority that permits it to reject binding case law from the United States Supreme Court or the Tenth Circuit with respect to qualified immunity based on an unpublished law review article.

[11] The Court addresses Defendant Wilson's entitlement to qualified immunity on individual grounds before considering Plaintiff's claim premised on his supervisory role.

19

more" needed to be done for Mr. Maes.  [Doc. 124 at 27–28].  Plaintiff alleges that this conduct

violated Mr. Maes's constitutional rights under § 1983.[12]

Courts treat cases of jail suicides as a failure to provide medical care.  *Barrie v. Grand
Cnty.*, 119 F.3d 862, 866 (10th Cir. 1997).  Typically, this would constitute a claim under the

Eighth Amendment to the United States Constitution.  *E.g. Estelle v. Gamble*, 429 U.S. 97, 104

(1976) (holding that a prison official's deliberate indifference to a prisoner's "serious medical

needs" violates the Eighth Amendment).  As a pretrial detainee rather than a prisoner, Plaintiff

relies on the Fourteenth Amendment's due process clause, which provides the same protection for

medical attention as a convicted inmate would receive under the Eighth Amendment, *Barrie*, 119

F.3d at 867, and the same deliberate indifference standard governs, *Strain v. Regalado*, 977 F.3d

984, 989 (10th Cir. 2020).

A prison official may be deliberately indifferent to a prisoner's medical need where that

official "prevent[s] an inmate from receiving treatment or den[ies] him access to medical personnel

capable of evaluating the need for treatment."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th

---

[12] As previously explained, § 1983 is not a source of substantive rights.  [Doc. 187 at 6 (citing
*Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1536 (10th Cir. 1995) (reasoning that § 1983 "does not
create any substantive rights, but merely provides relief against those who, acting under color of
law, violate federal rights *created elsewhere*" (emphasis added)))].  Plaintiff does not identify a
particular constitutional provision at issue in Count Seven (or any other the other counts addressed
in this Memorandum Opinion and Order).  *See* [Doc. 1 at ¶¶ 167–203].  Earlier in the Complaint,
Plaintiff states that "[t]his is an action under Title 42, Section 1983 of the United States Code for
violations of the Fourteenth Amendment to the United States Constitution" for a variety of
allegations, which appear to capture all except those raised under state law.  [Doc. 1 at ¶ 4].
Consistent with its ruling on Defendant Macias's Motion for Partial Summary Judgment [Doc.
187], the Court construes Plaintiff's claims against Defendant Wilson in his individual capacity as
raised under the Fourteenth Amendment's due process clause.  *See Barrie v. Grand Cnty.*, 119
F.3d 862, 866 (10th Cir. 1997) (observing that "claims based on a jail suicide are considered and
treated as claims based on the failure of jail officials to provide medical care for those in their
custody," and that right arises under the Fourteenth Amendment for pretrial detainees).  This same
analysis holds with respect to the claims raised against Defendants Wells and Shields in their
respective individual capacities.

Cir. 2000). Deliberate indifference includes two components: one objective, and one subjective. The objective component is met if the deprivation is 'sufficiently serious.'" *Id.* at 1209 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). In the context of liability for prison suicide, "the risk of, or potential for, suicide involves a sufficiently serious medical need and/or harm such that the objective prong . . . is met." *duBois v. Payne Cnty. Bd. of Cnty. Comm'rs*, 543 F. App'x 841, 846 (10th Cir. 2013). As such, the relevant inquiry for this Court in determining whether there is a cognizable Fourteenth Amendment violation is whether Plaintiff has adduced sufficient evidence to meet the subjective prong. *See* [Doc. 102 at 20].

The subjective component of a deliberate indifference claim "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837). Mere negligence, however, is not sufficient. *Farmer*, 511 U.S. at 835. Put differently, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [ ]he must also draw the inference.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837). In the case of an inmate's death, "a 'mere opportunity for suicide, without more,' is not enough to impose . . . liability." *Yazzie v. Bd. of Cty. Comm'rs of San Juan Cnty.*, No. CV 12-479 KG/GBW, 2014 WL 12786915, at *4 (D.N.M. Oct. 16, 2014). Defendant Wilson has invoked qualified immunity to shield himself from liability as an individual and a supervisor by arguing that Plaintiff has failed to establish either a cognizable constitutional violation or that such violation was clearly established as of November 2019. [Doc. 102 at 19–22].

**Cognizable Fourteenth Amendment Violation.** The County Defendants argue that the Estate's individual capacity claim fails on the "latter prong of deliberate indifference, as the Estate has failed to show Wilson subjectively disregarded a substantial risk that Maes was going to

commit suicide." [Doc. 102 at 20]. The record reflects the following undisputed facts. Defendant Wilson was present at the SCJ on the night of November 16, 2019, at least in an attempt to fix a radio. [Doc. 102 at ¶ 11; Doc. 124 at 3, ¶ 13]. Upon Defendant Wells's arrival at the SCJ with Mr. Maes, Defendant Wilson assisted in placing Mr. Maes into a jail uniform and into his cell. [Doc. 102 at ¶ 18; Doc. 124 at 4, ¶ 18]. But for another inmate, Mr. Maes would have been placed in the "tank" that is designed to house inmates who have been placed on suicide watch and those who are intoxicated or are displaying behavioral problems. [Doc. 102 at ¶ 16; Doc. 124 at 1]. He heard Mr. Maes say "I'm trying to kill myself," and Defendant Wilson responded by asking "You're trying to kill yourself right now?" [Doc. 102 at ¶ 22; Doc. 124 at 4, ¶ 22; Doc. 102-1 at 185:19–24; 226:23–227:1; 263:18–23]. He also observed Mr. Maes striking his head against the cell wall, [Doc. 124-1 at 91:2–8], believed he was eligible for treatment at a detox center, [*id.* at 253:15–20], and thought "something more" should be done to treat him, [*id.* at 253:21–254:3]. In response to a question about his training on how to respond in any specific way to an inmate who is making statements about suicide, Defendant Wilson testified "[i]f the totality is such that you were to call mental health and you actually know or are convinced that this is a situation where they are suicidal, then you call mental health." [Doc. 124-1 at 80:25–81:8]. At some point during the night, Defendant Shields made a call to mental health. [Doc. 102 at ¶ 29 (citing Doc. 102-5 at 61:13–16; 63:2–6); Doc. 124 at 5, ¶ 29].

The record also reflects at least the following disputed facts or inconsistencies. The Parties dispute Mr. Maes's demeanor at the SCJ, i.e., whether Mr. Maes was "funny, lighthearted, [and] cordial," [Doc. 102 at ¶ 18], or whether he was "gloomy, intoxicated, [and] inflicting self-harm using his head," [Doc. 124 at 4, ¶ 18]. To that end, Defendant Wilson testified that "[e]very interaction [he] had with [Mr. Maes], he was funny, light-hearted, cordial," [Doc. 102-1 at 186:25–

22

76

187:1], but Defendant Shields testified that Mr. Maes was "yelling, and being a little noncompliant" and was "just making a scene." [Doc. 102-6 at 44:18–24]. Defendant Shields testified that the standard operating procedures indicated that she needed to talk to her supervising officers about the possibility of a suicide watch, and she called Defendant Wilson to come to the station. [*Id.* at 52:11-16]. But Defendant Wilson testified that he was "called in that night to reset our radio console." [Doc. 124-1 at 20:11–16]. Defendant Wilson originally testified that he only became aware of Mr. Maes banging his head against the wall after the fact. [*Id.* at 184:22–25], but later conceded that he saw Mr. Maes hit his head once, [*id.* at 185:11–14], and Defendant Shields also testified that Defendant Wilson was part of a group that she overheard discussing that Mr. Maes was hitting his head, [Doc. 102-6 at 51:6–13]. Defendant Wells testified that, after a conversation with Corporal Steve Hansen ("Corporal Hansen"), she informed Defendant Wilson of her own conversation with Corporal Hansen in which Corporal Hansen confirmed that Mr. Maes needed to be put on suicide watch; mental health needed to be notified; and Mr. Maes could not be released until he was evaluated by mental health. [Doc. 113-3 at 128:4–129:21]. Defendant Wilson testified that he had no understanding of the conversation between Deputy Wells and Corporal Hansen. [Doc. 124-1 at 256:6–10].[13] Defendant Wilson testified that he was not aware of the attempt to call mental health at the time, [*id.* at 107:20–108:5], but Defendant Shields testified that she told Defendant Wilson that mental health did not answer, [Doc. 102-6 at 61:23–62:5].

---

[13] On Reply, the County Defendants do not dispute Defendant Wells's testimony about the substance of her conversation with Corporal Hansen, or that she relayed her opinions about how Mr. Maes needed to be treated or her conversation with Corporal Hansen to Defendant Wilson. [Doc. 142 at 11–13].

"Determining whether a defendant possessed actual knowledge of the substantial risk of harm is a question of fact and can be proven in the usual ways, including by circumstantial evidence." *See Est. of Roundtree by & through Roundtree v. Correct Care Sols., LLC*, No. 19-cv-00167-RBJ, 2021 WL 981309, at *9 (D. Colo. Mar. 16, 2021). "[T]here is no requirement that defendants have the express intent to harm the victim of the alleged indifference." *Id.* (citing *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996)). Further, a plaintiff is not required to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." *Id.* (citing *Farmer*, 511 U.S. at 842).

While Defendant Wilson testified that he did not believe that Mr. Maes was actually suicidal, [Doc. 102-1 at 187:5–11], this Court notes that at summary judgment, it may not weigh facts or judge credibility. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Accordingly, this Court respectfully concludes that there is a genuine issue of material fact as to whether Defendant Wilson "kn[ew] of and disregard[ed] an excessive risk to [Mr. Maes's] health or safety.'" *Sealock*, 218 F.3d at 1209.

***Clearly Established.*** Having found that the above factual disputes could lead a jury to reasonably conclude that Defendant Wilson knew of and disregarded an excessive risk to Mr. Maes's health or safety, this Court addresses the second prong—whether the contested constitutional right was "clearly established" as of November 2019. The Tenth Circuit has explained the "clearly established" prong of the qualified immunity analysis as follows:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although

24

plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the particular conduct is clearly established. . . . Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted). "Ordinarily, a plaintiff may satisfy this clearly-established-law standard by identifying an on-point Supreme Court or published Tenth Circuit decision that establishes the unlawfulness of the defendant's conduct," or "the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quotation and brackets omitted). "[T]he precedent must have clearly established the right in light of the specific context of the case, not as a broad general proposition." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quotation omitted). The Tenth Circuit employs a sort of sliding-scale analysis in analyzing precedent, under which "the more obviously egregious the conduct in light of prevailing constitutional principles the less specificity is required from prior case law to clearly establish the violation." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015).

Plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time, *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000), and should cite to "what [s]he thinks constitutes clearly established law," *Crane*, 15 F.4th at 1303. Plaintiff appears to concede that there is no Supreme Court or Tenth Circuit case law that reflects the same or substantially similar facts as this case. [Doc. 124 at 26–27]. Instead, Plaintiff argues that "[b]y November 2019, it was clearly established that a jailer must act in response to a substantial risk of serious harm, and in the specific context of suicide prevention, an

25

official who consciously disregards an obvious and serious medical need may violated clearly established law even if there is no case directly on point."  [*Id.* at 26 (quotation omitted)].

The Court first notes that purported failures, i.e., that Defendant Wilson failed to take more action when (1) he heard Mr. Maes mention that he was attempting to kill himself once, (2) he observed Mr. Maes striking his head, (3) he believed Mr. Maes was eligible for detox, and (4) he believed "something more" needed to be done for Mr. Maes, [Doc. 124 at 27–28]—standing alone—would not persuade this Court that a clearly-established constitutional right existed. Indeed, the Tenth Circuit has held that a single suicidal remark does not give rise to deliberate indifference to a substantial risk of suicide.  *See*, *e.g.*, *Daniels v. Glase*, 198 F.3d 257, 1999 WL 1020522, at *5 (10th Cir. 1999) (unpublished table decision) (no deliberate indifference where decedent committed suicide after "suggesting that the thought of suicide had crossed his mind"); *Carey v. Buitrago*, No. 19-cv-02073-RM-STV, 2020 WL 3620324, at *9 (D. Colo. Mar. 18, 2020), *report and recommendation adopted*, 2020 WL 1921756 (D. Colo. Apr. 21, 2020); *Hensley v. Bucks Cnty. Corr. Facility*, No. 15-6098, 2016 WL 4247637, at *11 (E.D. Penn. Aug. 11, 2016) (an inmate's single statement, "I'm suicidal put me on suicide watch," to a prison official as the inmate was being moved from one cell to another was not an "obviously serious suicide threat"). *Cf. Cox v. Glanz*, 800 F.3d 1231, 1250 (10th Cir. 2015) (declining to hold jail officials liable when decedent inmate appeared "fine" to the officials).  Similarly, had Defendant Wilson only observed Mr. Maes banging his head against the wall, this Court would follow precedent that holds "strange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn," cannot give rise to deliberate indifference liability.  *See Est. of Novack v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000).  Nor does behavior that is "susceptible to a number of interpretations"—even where it may "arguably be viewed as" a suicidal characteristic—give rise

26

to a clearly established deliberate indifference claim as of November 2019. *Heidel v. Mazzola*, 851 F. App'x 837, 840 (10th Cir. 2021). Mr. Maes's intoxication alone also does not indicate a risk of suicide. *See, e.g*, *Est. of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (no deliberate indifference where detainee was severely intoxicated prior to committing suicide and prison officials did not provide her with medical treatment); *Eggert v. Chaffee Cnty.*, No. 10-cv-01320-CMA-KMT, 2011 WL 1259616, at *3 (D. Colo. Mar. 29, 2011) ("[I]ntoxication itself is not enough to indicate a risk of suicide. Nothing in the facts alleged, even when taken as true, gives rise to the inference that the jail officials knew that [decedent] was suicidal. In short, Plaintiffs have failed to state a claim that would allow a reasonable inference that the jail officials were deliberately indifferent."). Even Defendant Wilson's statement to Defendant Wells that "something more needed to be done" for Mr. Maes alone would not persuade the Court that Defendant Wilson was on notice that his failure to act could give rise to an extant clearly-established constitutional violation.

But the aggregation of these risk factors, along with construing all inferences of the disputed facts in favor of the Estate, leads this Court to conclude that despite the lack of a Supreme Court or Tenth Circuit case that has facts on all fours, it was clearly established as of November 2019 that prison officials are deliberately indifferent if they fail to take reasonable steps to protect a pretrial detainee or an inmate from suicide when they have subjective knowledge that person is a substantial suicide risk. *Crane*, 15 F.4th at 1307 (citing *Cox*, 800 F.3d at 1248–49). In *Elliott v. Cheshire County*, 940 F.2d 7 (1st Cir. 1991), the Court of Appeals for the First Circuit ("First Circuit") affirmed the denial of summary judgment in light of the disputed, material fact that the plaintiff's threats of self-harm had been reported to the defendants. *Id.* at 12. Here, Defendant Wilson not only observed Mr. Maes's head banging, but also undisputedly heard, and responded

27

to, Mr. Maes's statement that he was attempting to kill himself. In addition, Defendant Wilson admits that, had the suicide prevention "tank" been open that night, he would have placed Mr. Maes in that tank. [Doc. 102 at ¶ 16; Doc. 124 at 1]. And at least two others—Defendants Shields and Wells—testified that they each directly interacted with Defendant Wilson regarding placing Mr. Maes on suicide watch. *See* [Doc. 102-6 at 52:11–16 (Defendant Shields); Doc. 124-11 at 117:23–118:7 (Defendant Wells)]. Given that the resolution of whether Defendant Wilson recklessly disregarded a substantial risk of suicide in light of these events requires an evaluation of the credibility of the witnesses and the weighing of evidence, this Court concludes that such functions can only be accomplished by the factfinders at trial.[14] *Elliott*, 940 F.2d at 12.

As such, the Court respectfully **DENIES** the County Defendants' Motion with respect to Plaintiff's claim against Defendant Wilson in his individual capacity in light of this Circuit's qualified immunity doctrine.

### 2.    Count Six: Defendant Wilson – Supervisory Liability

Count Six involves claims against Defendant Wilson in his individual capacity, though this time alleging that he "failed to provide adequate supervision over the SCJ with deliberate indifference to the consequences." [Doc. 1 at ¶ 195]. Plaintiff claims that Defendant Wilson "is responsible for supervising the operational aspects of the SCJ," and that this failure to supervise "was the direct and proximate cause of the injuries and damages" suffered by Plaintiff. [*Id.*]. This is thus a claim for supervisory liability raised against Defendant Wilson in his individual capacity for violation of Mr. Maes's Fourteenth Amendment rights pursuant to § 1983.

---

[14] This Court finds *Turney v. Waterbury*, 375 F.3d 756 (8th Cir. 2004), cited by Plaintiff, to be distinguishable. In *Turney*, the reversal of qualified immunity was to an individual Defendant who had knowledge of Turney's prior suicide attempt. Here, there is no evidence (or allegation) that any of the Defendants knew that Mr. Maes had suffered from mental health issues; previously voiced suicidal ideations; or previously attempted suicide.

28

Supervisory liability under § 1983 is distinct from a theory of respondeat superior.[15] *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010). On the one hand, "a supervisory relationship alone is insufficient for liability under § 1983." *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009). On the other hand, a defendant may be liable if a plaintiff can show that an "affirmative link exists between the [constitutional] deprivation and either the [officer's] personal participation, his exercise of control or direction, or his failure to supervise." *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997). That showing can be made with "deliberate, intentional act[s]" that "caused or contributed to the . . . violation." *Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir. 1996). The Tenth Circuit has elucidated a three-part test clarifying Plaintiff's burden in demonstrating supervisory liability under § 1983:

> A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Dodds*, 614 F.3d at 1199.

Defendant Wilson is responsible for overseeing the SCJ, and was present at the SCJ on the night of Mr. Maes's death, at least in part, to repair the dispatcher's radio console. [Doc. 102 at 4; Doc. 124 at 3, ¶ 13]. But the mere fact that Defendant Wilson was present at the jail on November 16, 2019, or the fact that he was responsible for overseeing its operation, does not establish that he is liable as a supervisor under § 1983. Rather, "prison officials are deliberately indifferent if they fail to take reasonable steps to protect a pre-trial detainee or an inmate from suicide when they

---

[15] The Supreme Court has characterized the term "supervisory liability" as "a misnomer," inasmuch as it may imply pure vicarious (that is, respondeat superior) liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The Court employs the term here solely for the sake of convenience, and recognizes that supervisory liability in the § 1983 context is not coextensive with traditional theories of vicarious liability.

have subjective knowledge that person is a substantial suicide risk." *Crane*, 15 F.4th at 1307. As such, Plaintiff's claim requires "a particularized state of mind: actual knowledge by a prison official of an individual inmate's substantial risk of suicide." *Cox*, 800 F.3d at 1249. That knowledge could have come from a subordinate even if a supervisory defendant "had no personal interaction with [the prisoner] or direct and contemporaneous knowledge of his treatment." *George v. Beaver Cnty.*, 32 F.4th 1246, 1256 (10th Cir. 2022).

For the reasons articulated above—including his own interactions with Mr. Maes and Defendant Shields's testimony about asking about suicide watch and informing Defendant Wilson that she had called mental health—this Court respectfully **DENIES** summary judgment as to Count Six.[16]

### 3.    Count Nine: Defendant Wells – Individual Liability

Count Nine of Plaintiff's Complaint is raised against Defendant Wells and is the sole claim in which she is named. [Doc. 1 at ¶¶ 200–01]. Plaintiff's allegations mirror Count Seven in alleging that she "exhibited deliberate indifference to the welfare of [Mr. Maes] despite actual knowledge that [Mr. Maes] had communicated suicidal ideation at the SCJ while appreciating that [Mr. Maes] was extremely intoxicated." [*Id.* at ¶ 201]. Defendant Wells also invokes qualified immunity—arguing first, that she did not act with deliberate indifference to Mr. Maes's serious medical needs, and second, that no clearly established law existed in November 2019 that would have advised a deputy in her position that her conduct would constitute a constitutional violation. [Doc. 104 at 5–9]. Plaintiff disagrees, pointing to Tenth Circuit and out-of-Circuit law for support. [Doc. 113 at 8–9 (citing *Rife v. Jefferson*, F. App'x 377, 386 (10th Cir. 2018); *McCowan*, 945 F.3d

---

[16] This Court acknowledges that, though it concluded that Plaintiff had failed to prove that the loss of the recording of Defendant Shields making a call to mental health prejudiced the Estate, that recording could have established facts favorable to either side.

at 1276; *Conn. v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003); *Snow v. City of Citronelle*, 420 F.3d 1262, 1270 (11th Cir. 2005); *Gordon v. Kidd*, 971 F.2d 1087, 1096–97 (4th Cir. 1992))].    Defendant Wells replies by distinguishing these cases, and arguing, *inter alia*, that (1) the alleged suicidal ideation expressed to Defendant Wells while en route to the SCJ is based solely on inadmissible hearsay and (2) the suicidal statement she overheard at the SCJ is insufficient evidence to constitute a violation of clearly established law.

   ***Inadmissible Hearsay.***  Plaintiff contends that Defendant Wells first became aware of Mr. Maes's risk of suicide while she was transporting him from the site of his arrest to the SCJ. [Doc. 113 at 3, ¶ 20].  Defendant Wells denies that any such statement was made.  [Doc. 104 at ¶¶ 19– 20].  Plaintiff points to a Narrative Report prepared by Sergeant Richard Pascoe of the Saguache County Sheriff's Office on November 25, 2019 for support.  [Doc. 113-1].  Sergeant Pascoe responded to the SCJ on the morning of November 17, 2019, after learning of Mr. Maes's death. [*Id.* at 1].  While present at the jail, he reports that Defendant Wells arrived because "she had called earlier in the day to check on [Mr.] Maes because she was concerned about him from the previous evening."[17]  [*Id.*].  Pascoe records asking Wells why she was concerned:

> Wells stated she was concerned due to his level of intoxication and by some of the things he said.  I asked what [Mr.] Maes said and she stated that he had made the statement that he may as well just kill himself.  I asked what she did when he made the statement.  She stated she took it as just being an off handed comment and she did not really think he meant anything by the statement.  She did not believe by his actions and tone he was going to harm himself.

---

[17] Notably, Defendant Wells denies speaking to Sergeant Pascoe about the case at all.  [Doc. 113- 3 at 135:24–136:1 ("I never spoke to Sergeant Pascoe about this case, never.")].  She also denies mentioning anything regarding suicide.  [*Id.* at 137:3–6 ("Nothing—here it says I called because I was concerned about the level of intoxication and then—and about this statement that he killed himself.  Oh, none of this ever came up.")].

[*Id.* at 1]. Relying on the fact that Defendant Wells referenced the "things" (plural) Mr. Maes said, Plaintiff argues that the statement "I may as well just kill myself" is distinct from the "I'm trying to kill myself right now" statement that she overheard at the jail. [Doc. 113 at 3–4]. Plaintiff argues the statement must have been made in the car because of the timing of a subsequent call to Corporal Steve Hansen. [*Id.* at 4].

At summary judgment, the Court takes the facts in the light most favorable to the non-moving party. *Rowe v. United Airlines, Inc.*, 62 F. Supp. 3d 1225, 1231 (D. Colo. 2014). Yet, critically, "[h]earsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'" *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Wright–Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998)). Defendant Wells therefore argues that Sergeant Pascoe's report contains two levels of hearsay: (1) the report itself, which she contends is not admissible as a record of a regularly-conducted activity under Federal Rule of Evidence 803(6), and (2) Defendant Wells's statement reflecting Mr. Maes's statement, which she argues is not admissible under any applicable hearsay exception. [Doc. 150 at 4–5].

The Court respectfully agrees with Defendant Wells that Mr. Maes's statement as recorded in Sergeant Pascoe's Report constitutes inadmissible hearsay. While true that "[i]n a civil case, police reports may be admissible as public records under rule 803(8)(A)(ii) of the Federal Rules of Evidence," that exception "covers only information that the officer observed and recorded in the police report, and not information that the officer received from third parties." *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1071 n.6 (D.N.M. 2015). In this case, Mr. Maes's alleged statement—something to the effect of "I may as well kill myself"—was not personally observed by Sergeant

Pascoe, but rather, reflects Defendant Wells's alleged conversation with Mr. Maes.  Because the statement, as recorded in the police report, constitutes inadmissible hearsay, the Court cannot consider it at summary judgment.  *See* Fed. R. Evid. 805 (providing that hearsay within hearsay is not excluded by the rule against hearsay" only "if *each* part of the combined statements conforms with an exception to the rule" (emphasis added)).

***Qualified Immunity.***  Setting aside consideration of the inadmissible hearsay offered by Plaintiff, the Court must still conduct the two-step qualified immunity analysis detailed above: first, resolving whether Defendant Wells violated Mr. Maes's constitutional rights, and second, resolving whether the right at issue was clearly established at the time of the alleged unlawful activity.  *Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015).  The Court finds that the second prong is dispositive and will address it first.

To briefly recap Defendant Wells's actions on the night of November 16, 2019, she arrested Mr. Maes on an outstanding warrant for failure to appear at a hearing regarding a traffic ticket. [Doc. 104 at ¶ 11].  He was heavily intoxicated at the time, and she transported him to the SCJ. [*Id.* at ¶¶ 7, 13].  She—along with Defendants Wilson and Macias—was present when Mr. Maes said "I'm trying to kill myself right now."  [*Id.* at ¶ 19].  She advised him to lie down, which Mr. Maes refused to do.  [Doc. 102 at ¶ 21].  Defendant Wells remained in the dispatch area of the SCJ talking with Defendant Shields during the approximate time that Mr. Maes committed suicide. [Doc. 102 at ¶¶ 31–32; Doc. 124 at 1].  Upon departing the SCJ, Defendant Wells testified that she had no concerns for Mr. Maes's welfare because she "did what[] [she] needed to do."  [Doc. 113-3 at 153:5–14].  It is also undisputed that Defendant Wells was not employed at the SCJ; rather, in November 2019, she was a Saguache County Sheriff's Deputy who was primarily assigned to work

court security in the Saguache County Courthouse and assisted as a road deputy on weekends when needed. [Doc. 104 at 1; Doc. 113 at 1, ¶ 1].

Broadly speaking, Plaintiff alleges that Defendant Wells acted with deliberate indifference toward Mr. Maes's serious medical needs from the moment of his arrest until his suicide while detained at the SCJ. [Doc. 113 at 6–11]. She argues that, prior to November 2019, "it was clearly established in the Tenth Circuit that an arresting officer has a duty to respond to an arrestee with a serious medical condition." [*Id.* at 8]. Plaintiff thus claims that Defendant Wells's failure to seek care for Mr. Maes after he informed her of his suicidal ideation constitutes a violation of clearly established law.

The Court respectfully disagrees. Plaintiff argues extensively that Defendant Wells "concealed" at least one suicidal statement made prior to his arrival at the SCJ, but there is no admissible evidence that there was any suicidal statement to conceal in the first place. Therefore, the Court is left with Defendant Wells's undisputed testimony that she never spoke to Sergeant Pascoe, that she never told Sergeant Pascoe that Mr. Maes had expressed suicidal ideation to her prior to his arrival at the jail, and that Mr. Maes never actually expressed suicidal ideation to her prior to her arrival at the jail. *See* [Doc. 113-3 at 135:6–136:18].[18]

_____

[18] Because the Court cannot consider Plaintiff's allegation that Mr. Maes expressed suicidal ideation while en route to the jail, the argument that Defendant Wells violated Mr. Maes's constitutional rights by not seeking medical attention also fails. Citing *Rife*, 742 F. App'x at 386, Plaintiff points out the Tenth Circuit's conclusion that "it has been clearly established for more than a decade that when an arrestee not only informs an arresting officer of the internal symptoms of a serious medical condition but also displays outward signs of the need for medical attention, the arresting officer violates the Fourteenth Amendment by failing to seek such care." [Doc. 113 at 8]. Here, there is no admissible evidence that Mr. Maes informed Defendant Wells of prior suicidal thoughts, and Plaintiff's Fourteenth Amendment claim against Defendant Wells is not premised on a failure to seek medical treatment for his obvious intoxication; as such, *Rife* is inapposite.

Based on the record before the Court, the only medical condition that was apparent to Defendant Wells at the time of Mr. Maes's arrest was his heavy intoxication. *See* [Doc. 104 at ¶ 7]. In addition, even assuming that Defendant Wells mischaracterized Mr. Maes as combative to avoid taking him to detox, *see* [Doc. 113 at 2, ¶ 15], Plaintiff presents no clearly-established law that would have placed Defendant Wells on notice that transporting an intoxicated individual to a jail instead of detox would constitute deliberate indifference to that individual's substantial risk of suicide. *See, e.g.*, *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1026 (3d Cir. 1991) (holding that a detainee's intoxication is insufficient to give jail officials knowledge that the particular detainee poses a suicide risk); *Belcher v. Oliver*, 898 F.2d 32, 35 (4th Cir. 1990) (same); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983) (same).

*Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985), established that an intoxicated individual who was *unconscious* upon his admission to a county jail prior to his death had experienced a deprivation of his constitutional rights when he was not transported to a hospital. *Id.* at 308. Since *Garcia*, however, the Tenth Circuit has been careful to distinguish "intoxication" from "unconsciousness," and there is no evidence in this record to support the notion that Mr. Maes was unconscious upon his arrest, arrival at the jail, or placement in his cell. *See Est. of Hocker*, 22 F.3d at 999. Instead, the undisputed facts establish that Mr. Maes was conscious and interacting with Defendants. *See, e.g.*, [Doc. 104 at ¶ 19; Doc. 113 at 3, ¶ 19]. As such, there is no clearly-established law that would have required Defendant Wells to transport Mr. Maes to a detox center rather than to the SCJ.

It is undisputed that once Mr. Maes arrived at the SCJ that Defendant Wells observed him striking his head and stating that "I'm trying to kill myself right now." *See, e.g.*, [Doc. 104 at ¶ 19; Doc. 113 at 3, ¶ 19]. But as observed above, no Tenth Circuit or Supreme Court authority indicates

35

89

that a single suicidal remark gives rise to deliberate indifference to a substantial risk of suicide. *See*, *e.g.*, *Daniels*, 1999 WL 1020522, at *5 (no deliberate indifference where decedent committed suicide after "suggesting that the thought of suicide had crossed his mind"); *Carey*, 2020 WL 3620324, at *9.

Plaintiff also claims that Defendant Wells intentionally interfered with Mr. Maes's need for medical care. [Doc. 113 at 10]. She contends that Defendant Wells was aware that Mr. Maes was not combative and that he was "acutely suicidal," and she demonstrated deliberate indifference to Mr. Maes's medical needs in failing to provide that information to the booking officer at the SCJ. [*Id.*]. Plaintiff accurately notes that deliberate indifference may be shown "not only by failure to provide prompt attention to the medical needs of a pre-trial detainee, but also by intentionally interfering with the treatment *once prescribed*." *Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990) (emphasis added). Yet Plaintiff's argument still falls short; the record bears out no prescribed medical treatment, and the thrust of Plaintiff's other arguments is that Defendant Wells played a central role in denying Mr. Maes any treatment—prescribed or otherwise—in the first place. Indeed, elsewhere in the record, Plaintiff contends that Defendant Wells informed Defendant Wilson of the need to put Mr. Maes on suicide watch, [Doc. 124 at 27], but there is no evidence that Defendant Wells had either: (1) the responsibility or the authority to place Mr. Maes on suicide watch or (2) prevented any other individual from doing so.

Finally, Plaintiff points to Defendant Wells's knowledge of a prior suicide at the SCJ—that of Felix Granados in 2008—involving substantially similar circumstances. [Doc. 113 at 10]. Defendant Wells was called to the SCJ following the discovery of Mr. Granados's body; when she arrived, he was lying on his left side with a shower curtain tied around his neck. [Doc. 113-7 at 17]. Mr. Granados was later determined to be dead. [*Id.*]. Plaintiff argues that this knowledge of

36

a prior suicide at the SCJ—committed using substantially the same methodology as that employed by Mr. Maes—renders Defendant Wells's inaction "even more shocking." [Doc. 113 at 10–11]. But Plaintiff directs the Court to no clearly-established law holding that knowledge of a prior suicide in a facility required any particular action from Defendant Wells—who is not an employee of the SCJ. Indeed, Plaintiff's argument sidesteps an essential point: that, in order to establish that Defendant Wells acted with deliberate indifference, Plaintiff must show "actual knowledge of the *specific* risk of harm [*to the detainee*] . . . or that the risk was so substantial or pervasive that knowledge can be inferred." *Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990) (emphasis added). It follows that knowledge of a *prior* suicide more than a decade prior to November 2019 does not speak to the risk of *Mr. Maes's* suicide. *See Cox*, 800 F.3d at 1251 (indicating that state actor's knowledge of *that particular inmate's* risk of suicide would be sufficient to violate clearly established law prohibiting deliberate indifference to significant risk of serious harm); *Matis v. Johnson*, 262 F. App'x 671, 673 (5th Cir. 2008) (jury could conclude that intake nurse at juvenile facility acted with deliberate indifference because she "had actual knowledge of [*the detainee's*] prior suicide attempt and failed to properly complete the intake form that would have revealed [the detainee's] suicide risk to other staff members"). In sum: Plaintiff has not overcome the burden to show that Defendant Wells violated any clearly-established law in her arrest of, transport of, or interactions with Mr. Maes. As such, qualified immunity shields her from liability with respect to Count Nine and the Defendant Wells's Motion for Summary Judgment is accordingly **GRANTED**.

### 4.    Count Ten: Defendant Shields – Individual Liability

The County Defendants next argue for summary judgment with respect to the § 1983 claim raised against Defendant Shields in her individual capacity.[19]  [Doc. 1 at ¶¶ 202–03].  As with the other defendants sued in their individual capacities, Defendant Shields's invocation of qualified immunity shifts the burden to Plaintiff to demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Quinn*, 780 F.3d at 1004.  Plaintiff cross-references Section III(H)(1) of the Response to demonstrate that Defendant Shields is not entitled to qualified immunity.  [Doc. 124 at 30].  This section addresses qualified immunity in the context of claims raised against Defendant Wilson; liberally construed, it appears Plaintiff is again conceding the absence of cases with materially similar facts and is relying on the alleged obviousness of the constitutional violation to satisfy the "clearly established" requirement.  *See* [*id.* at 26].  Given this reference, the Court will determine whether Plaintiff has overcome the burden to demonstrate that Defendant Shields's conduct was so obviously unlawful that she violated Mr. Maes's clearly-established rights.  *See Browder*, 787 F.3d at 1082.

In the Complaint, Plaintiff argues that Defendant Shields was deliberately indifferent to Mr. Maes's welfare despite appreciating his intoxication.  [*Id.* at ¶ 203].  The County Defendants argue that "[o]ther than observing [Mr.] Maes when he walked into the Jail, in which she described him as intoxicated and high," she never communicated with Mr. Maes or heard any suicidal ideation.  [Doc. 102 at 24].  Plaintiff responds by noting that Defendant Shields was advised that Mr. Maes had been banging his head on his cell wall and could be suicidal, proceeded to call a

---

[19] The County Defendants characterize this claim as Plaintiff's "Eighth Claim for Relief."  [Doc. 102 at 24].  It is Plaintiff's Tenth Claim for Relief.  *See* [Doc. 1 at ¶¶ 202–03].

mental health facility, and took no further action when the call went unanswered. [Doc. 124 at 30]. Plaintiff claims that this is evidence that Defendant Shields drew an inference of a suicide risk. [*Id.*]. Further, Plaintiff contends that Defendant Shields was aware that standard operating procedures were not followed with respect to potentially suicidal inmates, and that she failed to observe the camera feeds given "task saturation." [*Id.*].

Respectfully, these facts do not give rise to any violation of Mr. Maes's *clearly-established* constitutional rights. Defendant Shields never interacted with Mr. Maes and remained in the dispatch area while Defendants Wilson, Wells, and Macias engaged with him after he was placed in Cell One. She proceeded to call a mental health facility, and received no answer.[20] Plaintiff does not point to any case law—in this District, Circuit, or elsewhere—that would support the idea that this behavior constitutes deliberate indifference to a substantial risk of suicide. Indeed, the County Defendants note that there is no case law suggesting that a reasonable dispatcher in Defendant Shields's position would know to act when (1) supervision of inmates was not her responsibility, (2) no direct interaction between the dispatcher and suicidal inmate occurred, (3) the dispatcher did not believe the inmate was suicidal, and (4) the dispatcher did not hear the inmate express any suicidal ideation. [Doc. 102 at 26].

The Court finds this lack of precedent instructive. At bottom, Plaintiff has not cited case law that would serve to place Defendant Shields on notice that she was violating clearly established law at any point during the evening of Mr. Maes's suicide. Nor can this Court conclude that her conduct was so obviously unlawful as to overcome qualified immunity. "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law," *Aldaba*, 844 F.3d

---

[20] Plaintiff contends that this call demonstrates a belief that Mr. Maes was suicidal. [Doc. 124 at 30]. But Defendant Shields testified that "[she] didn't know he was suicidal." [Doc. 124-13 at 62:20].

at 877, and the Court does not believe that Defendant Shields falls into either category. While she *might* have observed Mr. Maes plan his suicide had she not been distracted by the lack of her radio and conversation with Defendant Wells, [Doc. 124-13 at 68:16–22], such conduct is at most negligent—not deliberately indifferent to Mr. Maes's medical needs. *See City of Canton v. Harris*, 489 U.S. 378, 389 n.7 (1989) (noting that deliberate indifference requires a higher degree of fault than negligence, or even gross negligence); *Est. of Hocker v. Walsh*, No. CIV-92-855-H, 1993 WL 664646, at *9 (W.D. Okla. Jan. 14, 1993) (concluding that, "[a]bsent any *knowledge of a risk that [inmate] would commit suicide*, the failure of jail personnel to take extra precautions, e.g., to monitor her cell more frequently is, at best, negligence" (emphasis added)). The same is true of her unanswered phone call to the mental health facility; while failure to follow up or inquire into other resources may evidence negligent behavior, it does not rise to the level of deliberate indifference. Finally, her failure to ensure that certain standard operating procedures for suicidal inmates were followed on the night of Mr. Maes's death does not rise to the level of deliberate indifference because failing to follow operating procedures to their letter does not *per se* demonstrate deliberate indifference. *See Heidel*, 851 F. App'x at 841 (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) (observing that "an officer's failure to follow internal jail policies does not automatically mean he or she acted with deliberate indifference"); *Ulibarri v. City & Cnty. of Denver*, 742 F. Supp. 2d 1192, 1222 (D. Colo. Sept. 30, 2010) ("The failures described, such as housing [inmate] in administrative segregation for his own safety, failing to provide an interpreter for the medical screening, and perhaps not conducting regular rounds, are at most negligent or ill-advised.").

At bottom, "the Due Process Clause is simply not implicated by a *negligent* act of an official," *see Daniels v. Williams*, 474 U.S. 327, 328 (1986), as liability under § 1983 requires

"more than ordinary lack of due care for the prisoner's interests or safety," *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Plaintiff has adduced insufficient evidence of conduct by Defendant Shields that a reasonable jury could conclude rises above negligence, and in any event has failed to pinpoint any precedent that would place Defendant Shields on notice that her conduct violated Mr. Maes's constitutional rights.

Given the lack of any clearly established law that would have placed Defendants Wells or Shields on notice that their actions were unconstitutional, qualified immunity shields them from liability in their individual capacities. As such, summary judgment in the County Defendants' favor is warranted on Count Ten and the Motion is accordingly **GRANTED**. Having resolved these individual claims, the Court turns to a consideration of the County Defendants' Motion with respect to Plaintiff's municipal liability claims.

### III.    Count One: Inadequate Physical Plant

Plaintiff's first municipal liability claim is raised against the Board under § 1983, and alleges that the SCJ's physical plant was inadequate for, *inter alia*, failing to provide for the direct supervision of intoxicated individuals expressing acute suicidal ideation, facilitating suicide by using cells with exposed bars, and utilizing privacy curtains in cells with exposed bars. [Doc. 1 at ¶¶ 167–172]. Plaintiff claims that these deficiencies were the direct and proximate cause of Mr. Maes's injuries, and that they "presented a substantial risk of serious harm to intoxicated persons with acute suicidal ideation, both individually and in combination." [*Id.* at ¶¶ 169, 172]. The County Defendants argue that summary judgment is warranted, given that Plaintiff did not show a pattern of similar instances of constitutional violations. [Doc. 102 at 9]. They also point out that the SCJ has one cell—defined elsewhere as the "tank"—used to house intoxicated inmates or those with behavioral problems. [*Id.*]. Finally, they contend that accepting Plaintiff's arguments "would

render almost every small, rural community [jail] vulnerable to constitutional challenge." [*Id.* at 10]. Plaintiff does not respond directly to these arguments, instead contending that the County Defendants' failure to address the "cumulative impact" and "highly predictive/plainly obvious standard" is fatal to their Motion. [Doc. 124 at 13–14].

The deliberate indifference standard governs claims involving conditions of confinement in jails and prisons. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). In the Tenth Circuit, a "municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Berry*, 900 F.2d at 1496.

The Constitution "does not mandate comfortable prisons."[21] *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Because the sufficiency of a conditions of confinement claim depends upon "the particular facts of each situation," "the circumstances, nature, and duration of the challenged conditions must be carefully considered." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (citations and internal quotation marks omitted). "It is important to consider the conditions of confinement as a whole because several deprivations in combination may constitute a constitutional violation when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Mitchell*, 80 F.3d at 1442 (internal quotation marks omitted).

Here, the Court is tasked with considering whether the deprivations outlined by Plaintiff are sufficient to impose liability upon a municipality under § 1983. "[M]unicipalities and municipal entities . . . are not liable under 42 U.S.C. § 1983 solely because their employees inflict injury on a plaintiff." *Fofana v. Jefferson Cnty. Sheriff's*, No. 11-cv-00132-BNB, 2011 WL

---

[21] While *Rhodes* addressed the Eighth Amendment, the Court's analysis turns on the congruent protections provided by the Fourteenth Amendment. *Barrie*, 119 F.3d at 868.

780965, at *2 (D. Colo. Feb. 28, 2011) (citing *Monell v. New York City Dep't of Social Servs.*, 436

U.S. 658, 694 (1978); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). Instead, to

establish a county's liability, the plaintiff must demonstrate three conditions. First, the plaintiff

must make a showing from the record that a municipal policy or custom directly caused his injury.

*Id.* Such a policy or custom must take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and

brackets omitted); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770

(10th Cir. 2013) ("A challenged practice may be deemed an official policy or custom for § 1983

municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or

practice, a final decision by a municipal policymaker, or deliberately indifferent training or

supervision.").

Second, and after identifying an official policy or custom, the plaintiff must demonstrate

causation by showing that the policy or custom "is the moving force behind the injury alleged."

*Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (quoting *Barney v. Pulsipher*,

143 F.3d 1299, 1307 (10th Cir. 1998)); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985)

(same). Third and finally, the plaintiff must demonstrate "that the policy was enacted or

maintained with deliberate indifference to an almost inevitable constitutional injury." *Cacioppo*,

528 F. App'x at 931 (quoting *Schneider*, 717 F.3d at 769).

As an initial matter, the County Defendants concede that the SCJ is not perfect. They note its age and size, and the undisputed facts suggest that certain improvements would aid in the functioning of the SCJ. [Doc. 102 at ¶ 13; Doc. 124 at ¶ 13 (noting broken radio)]. But "jails can almost always be better," *Est. of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1323 (11th Cir. 2005), which leaves the Court to determine whether Plaintiff has outlined deficiencies sufficiently grave to demonstrate deliberate indifference on the part of the Board.

Yet for the purposes of this analysis, it is enough for the Court to assume—without deciding—that the continued existence and operation of the SCJ constitutes a challenged policy or custom and that its physical plant was the moving force behind Plaintiff's constitutional injuries.[22] Even setting those threshold requirements aside, Plaintiff must still demonstrate that the continued use of the SCJ was "maintained with deliberate indifference to an *almost inevitable constitutional injury.*" *Cacioppo*, 528 F. App'x at 931 (emphasis added). As the Supreme Court has noted, "[w]ith deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." *Farmer*, 511 U.S. at 836. The Tenth Circuit is among those Courts of Appeal. *See Belcher v. United States*, 216 F. App'x 821, 823–24 (10th Cir. 2007) . Taking the record before it in the light most favorable to Plaintiff, the Court is unable to conclude that the Board acted recklessly in continuing to fund and approve of the operation of the SCJ.

As the County Defendants point out, the SCJ was equipped with one cell that was specifically designed to house inmates who are intoxicated or who are expressing behavioral problems. [Doc. 102 at ¶ 2]. On the night of Mr. Maes's suicide, that cell—the "tank"—was

---

[22] Plaintiff suggests as much in the Complaint, contending that the Board "forc[ed]" the Sheriff's Office to use the SCJ with the deficiencies outlined therein. [Doc. 1 at ¶ 171].

occupied by another inmate, necessitating his placement in another cell. [*Id.* at ¶¶ 16–17]. That cell was, in turn, able to be monitored by the dispatcher through use of a video system and by the jailer through use of physical checks. *See* [*id.* at ¶¶ 5–6]. The fact that no such checks were performed at the moment Mr. Maes committed suicide was therefore not a flaw in the SCJ's physical plant, but—at most—a flawed implementation of an inmate check protocol. And even then, there is no affirmative duty to constantly monitor inmates. *Gaston v. Ploeger*, 229 F. App'x 702, 711 (10th Cir. 2007) ("However, jailers are neither obligated nor able to watch every inmate at every minute of every day.").

In sum: taking these undisputed facts in the light most favorable to the non-moving party, no reasonable juror could conclude that the Board's policy or custom of continuing to operate the SCJ was "maintained with deliberate indifference to an almost inevitable constitutional injury."[23] *Cacioppo*, 528 F. App'x at 931. As such, summary judgment in the Board's favor is warranted with respect to Plaintiff's first claim and the Motion is respectfully **GRANTED**.

## IV.    Count Two: Inadequate Funding

Plaintiff's second count is also directed at the Board, and raises a § 1983 conditions-of-confinement claim predicated on inadequate funding. [Doc. 1 at ¶¶ 173–177]. She points to four funding deficiencies in particular: (1) "a failure to adequately fund staffing, retention, and supervision at the SCJ," (2) "a failure to adequately fund the [Saguache County Sheriff's Office] to provide medical and mental health care for intoxicated persons with acute suicidal ideations,"

---

[23] While demonstrating deliberate indifference is a high bar, the Tenth Circuit has noted that challenges to the physical attributes of a jail may be more properly raised under a state law tort theory of negligent design. *Bame v. Iron Cnty.*, 566 F. App'x 731, 740 (10th Cir. 2014) (reasoning that plaintiff's "argument about the water pipe, the blind spot, and the lack of a surveillance camera all sound remarkably like the tort of negligent design, a state remedy, not a constitutional violation," and granting summary judgment on § 1983 claim related to jail's physical features).

(3) "a failure to provide adequate funding for housing highly intoxicated persons expressing suicidal ideation in other jurisdictions" despite knowledge of inadequacies at the SCJ that increased the risk of harm to "a specific and reoccurring population of arrestees," and (4) "a failure to fund the construction of a jail that is adequate for the safekeeping of persons." [*Id.* at ¶ 175]. Plaintiff claims that these decisions were undertaken with deliberate indifference to their consequences, and that the alleged underfunding was the direct and proximate cause of the damages suffered by Mr. Maes. [*Id.* at ¶ 174].

The County Defendants move for summary judgment on this claim, arguing, *inter alia*, that "federal courts have been wary of imputing *Monell* liability on the basis of inadequate funding" and that Plaintiff has failed to demonstrate a causal nexus between any damages and the Board's funding decisions. [Doc. 102 at 11]. Plaintiff counters by arguing that the Tenth Circuit has recognized inadequate funding as a basis for municipal liability, and that the Board was aware of understaffing and issues with the jail's physical plant by at least 2016. [Doc. 124 at 17–18].

The Court's analysis is governed by the same legal standards outlined with respect to Plaintiff's first claim—namely, that Plaintiff must demonstrate that a policy or custom was the moving force behind a constitutional injury, and that it was enacted or maintained with deliberate indifference to that almost inevitable injury. *See Schneider*, 717 F.3d at 770; *Cacioppo*, 528 F. App'x at 931. While uncommon, however, the Court finds it settled that liability may rest against a municipality where deliberate indifference is evidenced by funding decisions. *Lopez v. LeMaster*, 172 F.3d 756, 763 (10th Cir. 1999), *abrogated in part on other grounds*, *Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020) (denying summary judgment on *Monell* claim where sheriff "told a jail investigator that the county commissioners failed to provide funding for correction of deficiencies at the jail likely to lead to assaults against inmates even though such

46

funding was required by [state] statutes"); *Ramos v. Lamm*, 639 F.2d 559, 573 n.19 (10th Cir. 1980) ("The lack of funding is no excuse for depriving inmates of their constitutional rights."); *Pendleton v. Bd. of Cnty. Comm'rs for Okla. Cnty.*, No. CIV-18-707-G, 2019 WL 4752269, at *7 (W.D. Okla. Sept. 30, 2019) ("While budget appropriations and expenditures are not a 'condition of confinement' per se, such appropriations and expenditures do, as Defendants concede, 'impact certain conditions of confinement,' and can therefore produce unconstitutional jail conditions, albeit indirectly.").

As a threshold matter, Plaintiff has adduced evidence that the Board did not provide the Sheriff's Office with the full amount of its requested funding. *E.g.* [Doc. 124-16 at 67:15–23]. Sheriff Warwick testified that all of his requested funds were necessary for the operation of the SCJ, and that one purpose of additional funds could be to eliminate alleged understaffing. [*Id.* at 71:2–5, 77:1–10]. The record is unclear as to why the Sheriff's Office never received the full funding it requested from the Board, [*id.* at 94:18–23], but funding for the SCJ may have been limited due to the budget requests of other elected officials or departments, [*id.* at 101:14–24].

Taken together, there exists a genuine dispute of material fact over the cause and impact of the Board's funding decisions on the operation of the SCJ and, in turn, whether Mr. Maes's constitutional injuries resulted from those decisions. It is possible that the Board's decision to underfund—at least relative to the Sheriff's Office's requests—the SCJ were not causally related to Mr. Maes's alleged constitutional injuries. It is also possible that the Board's funding decisions were not taken with deliberate indifference to Plaintiff's injuries. And of course, the opposite is true as well. But, at summary judgment, the Court will not substitute its judgment for that of a jury. *See Winton v. Bd. of Comm'rs of Tulsa Cnty.*, 88 F. Supp. 2d 1247, 1268 (N.D. Okla. 2000) (denying summary judgment to county where evidence suggested that funding for new jail could

have protected injured inmate, where county's past inaction could have led to conditions at current jail, and where county could be found deliberately indifferent). That is particularly the case where—as here—the record shows that the SCJ was on notice that insufficient funding contributed to potential constitutional violations at the time of Mr. Maes's death. Plaintiff claims that "lack of funding . . . caused [Sheriff] Warwick to fill jailer positions with unqualified or untrained individuals" like Defendant Macias. [Doc. 1 at ¶ 35]. And it is undisputed that Defendant Macias provided his notice of resignation from his position as a jailer at the SCJ on November 10, 2019. [Doc. 113-6 at 89:13–21]. He "felt overworked," was "very exhausted," and "was very tired all the time." [*Id.*]. Those statements could stem from those related to insufficient funding, as Plaintiff plainly assert in the Complaint. [Doc. 1 at ¶ 37 (claiming that "Macias provided a letter of resignation advising [Defendant] Warwick and [Defendant] Wilson of the following: (1) he had become less and less satisfied with the work situation; (2) he was unhappy with having to work every weekend; (3) he had not received a raise when others with less experience had; (4) the rate of pay was "exceptionally low;" (5) he received "little to no training on many things [he] was expected to do/perform," and (6) that his resignation was effective on November 24, 2019."). While such evidence does not mandate a particular verdict, the Court concludes that it demonstrates the existence of a genuine dispute of material fact with respect to Plaintiff's insufficient funding claim—namely, that the lack of resources at the SCJ deprived Mr. Maes of his rights guaranteed by the Fourteenth Amendment.

Given that a reasonable juror could conclude that the Board's customary practice of underfunding the SCJ was the moving force behind a constitutional injury, and that those judgments were undertaken and maintained with deliberate indifference to Plaintiff's almost inevitable injury, this Court **DENIES** summary judgment as to Plaintiff's second claim.

48

## V.    Count Three: Inadequate Supervision

Plaintiff next raises a claim for inadequate supervision under § 1983 against Sheriff Warwick in his official capacity.  [Doc. 1 at ¶¶ 178–182].  The Estate alleges that this inadequate supervision constituted an official policy or practice, and was the direct and proximate cause of Plaintiff's injuries and damages.  [*Id.* at ¶ 179].  She points to seven specific deficiencies: (1) failure to adopt a staffing pattern that provided adequate supervision to intoxicated individuals expressing suicidal ideation, (2) failure to adopt precautions, including direct supervision, double-celling, and discouragement of staff reliance on suicide contracts,[24] to protect intoxicated individuals expressing suicidal ideation, (3) permitting jailers to substitute monitor checks for direct welfare checks, (4) failure to adopt a requirement that staff members obtain a mental health clearance for intoxicated individuals expressing suicidal ideation, (5) the adoption of a policy admitting intoxicated individuals expressing suicidal ideation to the SCJ, (6) failure to adopt standardized suicide checks for intoxicated individuals expressing suicidal ideation, and (7) the supervision of intoxicated individuals expressing suicidal ideation by jail staff who had communicated concerns about their training, had a recent history of acting with indifference toward the welfare of others, and had recently communicated an intention to resign following an investigation into misconduct.  [*Id.* at ¶ 180].

The County Defendants principally contend that Sheriff Warwick lacked knowledge of a pattern of deficiencies at the SCJ that Plaintiff raises in her Complaint, and that the claims fail as a matter of law.  [Doc. 102 at 13].  Plaintiff argues that demonstrating a pattern of deficiencies is

---

[24] A "suicide contract" refers to an agreement in which a party agrees not to engage in self-harm. *See Tracy O. v. Anthem Blue Cross Life and Health Ins. Co.*, No. 2:16-cv-422-DB, 2017 WL 3437672, at *2 (D. Utah Aug. 10, 2017).  In this case, the Court construes references to a "suicide contract" as referring to Defendant Macias's conversation with Mr. Maes in which Mr. Maes agreed not to harm himself if Defendant Macias retrieved juice for him.

unnecessary, as the deficiencies she points to were "highly predictable" or "plainly obvious" consequences of the inadequate supervision she alleges. [Doc. 124 at 19]. The Estate also emphasizes the 2008 suicide of Felix Granados and its similarities to Mr. Maes's death. [*Id.* at 20].

"Suing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the county or municipality they represent," and thus courts apply the same standards of liability to municipalities as to official capacity claims against municipal officials. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). It follows that the Court applies *Monell* and its accompanying standards of liability in assessing whether Plaintiff's official capacity claim for inadequate supervision survives summary judgment. *See Graham*, 473 U.S. at 165–66. In other words, to withstand summary judgment on her inadequate supervision claims, Plaintiff must identify a policy or custom with respect to supervision that amounts to deliberate indifference and that is the moving force behind the alleged constitutional injury. *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1197–98 (D.N.M. 2004). Finally, "a municipality may be held responsible under § 1983 for inadequate supervision and training of its employees 'only where the failure to train [or supervise] amounts to deliberate indifference to the rights of persons with whom the [employees] come in contact.'" *Schepp v. Fremont Cnty.*, 900 F.2d 1448, 1454 (10th Cir. 1990) (quoting *City of Canton*, 489 U.S. at 388); *Brown v. Gray*, 227 F.3d 1278, 1291 (10th Cir. 2000) (applying same standard to inadequate training and inadequate supervision claims).

As an initial matter, the Court notes its disagreement with the County Defendants that the absence of a "pattern of suicides" at the SCJ is the relevant inquiry for the purposes of establishing *Monell* liability. *See* [Doc. 102 at 13]. Rather, the pertinent question is whether a policy or custom

50

*of inadequate supervision* was both deliberately indifferent to Mr. Maes's constitutional rights and the moving force behind his injuries. *See City of Canton*, 489 U.S. at 385. At the same time, however, the Court notes that Plaintiff's reliance on the 2008 suicide of Felix Granados is insufficient. [Doc. 124 at 20]. The focus on the Granados suicide comprises the entirety of Plaintiff's Response, essentially arguing that Sheriff Warwick was on notice of the potential for suicide in Cell One. [*Id.*]. While it is true that Mr. Granados's suicide bears similarities to Mr. Maes's suicide, those similarities do not speak to the constitutional adequacy of jail supervision (and Plaintiff does not argue as much). *See* [*id.*]. Moreover, the Tenth Circuit has repeatedly held that "[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations." *Coffey v. McKinley Cnty.*, 504 F. App'x 715, 719 (10th Cir. 2012); *see also Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019); *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) ("One instance, however egregious, does not a pattern or practice make."). In addition, the time between the two incidents—over a decade—weighs against the finding of a pattern. *See Heidel*, 851 F. App'x at 842 (reasoning that "one suicide-by-hanging from decades ago and one recent attempted suicide-by-drowning" was "not a pattern of conduct that would establish actual notice of a substantially high risk of suicide").

Furthermore, Plaintiff's Response does not argue that specific policies outlined in the Complaint were the moving force behind Mr. Maes's injuries, or that they were enacted or maintained with deliberate indifference to his rights. In fact, the record suggests that there were suicide protocols that were potentially unfollowed by Defendants. *See* [Doc. 102-3 at 5 ("If you have anyone on a sucide [sic] watch, please do 10 minute camera checks and 20 minute manual checks with pipe. No exceptions.")]; [Doc. 124 at 10, ¶ 23 ("*Other than* [Defendant] Macias

entering phantom site [sic] checks, staff acted consistent with policy in their management of" Mr. Maes.) (emphasis added)]. This leaves the County Defendants' arguments with respect to inadequate supervision essentially unrebutted, as Plaintiff has not pointed the Court to any facts in the record that would contradict the County Defendants' claims regarding the adequacy of supervision at the SCJ.

Indeed, a review of each alleged deficiency in supervision only bolsters this conclusion. First, Plaintiff alleges that Sheriff Warwick failed to adopt a staffing pattern that would provide adequate supervision to intoxicated individuals expressing suicidal ideation. [Doc. 1 at ¶ 180(a)]. Like the County Defendants, the Court interprets this deficiency as related to the single jailer-dispatcher model that Plaintiff references elsewhere in her briefing. *See, e.g.*, [Doc. 124 at 24]. That staffing model could not have been the "moving force" behind Mr. Maes's death because both a jailer and dispatcher were on duty at the SCJ when Mr. Maes committed suicide. [Doc. 102 at ¶¶ 10, 12].

Second, Plaintiff points to the failure to adopt precautions, including direct supervision, double-celling, and discouragement of staff reliance on suicide contracts, to protect intoxicated individuals expressing suicidal ideation. [Doc. 1 at ¶ 180(b)]. Yet it is unclear how these precautions—aside from direct supervision by jail staff—relate to the adequacy of supervision of intoxicated inmates expressing suicidal ideation, and Plaintiff makes no effort to explain as much. In any event, the Court has not located any case law that would transform the practice of *not* adopting any of the above precautions into a constitutional violation.

Third, Plaintiff claims that Sheriff Warwick failed to provide adequate supervision by permitting jail staff to substitute monitor checks for direct supervision checks on Mr. Maes. [Doc. 1 at ¶ 180(c)]. The County Defendants argue that Plaintiff failed to develop any record evidence

that the substitution of monitor checks had occurred on other occasions (so as to constitute a policy

or custom under *Monell*). [Doc. 102 at 15]. Plaintiff does not offer any counterargument in the

Response, and it is not the Court's role to comb through the extensive deposition testimony in this

matter to determine whether the County Defendants' representation is correct. *Abdelmeged v.*

*Colvin*, No. 14-cv-01643-REB, 2015 WL 5047645, at *6 (D. Colo. Aug. 26, 2015) ("This court is

neither required nor inclined to scour the record in search of evidence to support a party's

arguments."). Because Plaintiff cannot show that Sheriff Warwick or jail staff failed to perform

direct checks of inmates on any prior occasions, summary judgment is warranted. *George*, 32

F.4th at 1255.

Fourth, Plaintiff raises the failure to adopt a requirement that staff members obtain a mental

health clearance for intoxicated individuals expressing suicidal ideation. [Doc. at ¶ 180(d)]. As

with her second alleged deficiency, Plaintiff is arguing that the *absence* of particular precautions

constitutes deliberate indifference towards Mr. Maes's constitutional rights. Absent any record

evidence that a policy or custom of inadequate or nonexistent mental health clearances existed, or

any case law suggesting that the absence of such clearances constitutes deliberate indifference, the

Court again concludes that summary judgment is warranted.

Fifth, Plaintiff challenges the policy of admitting intoxicated individuals expressing

suicidal ideation to the SCJ without a mental health evaluation (with the knowledge that the SCJ

presented a suicide risk and was staffed by individuals with inadequate suicide training). [*Id.* at

¶ 180(e)]. Again, this conclusory allegation is not sufficient to survive summary judgment. As

the County Defendants note, there is no evidence that this policy—as defined by Plaintiff—was

enacted or maintained with deliberate indifference to the rights of Mr. Maes or any other inmates.

[Doc. 102 at 15]. Plaintiff does not rebut that argument with record evidence or argument, or

provide any case law in which courts have determined that such precautionary measures are constitutionally necessary prior to admitting an inmate to a jail or correctional facility.

Sixth, Plaintiff points to the failure to adopt standardized suicide checks for intoxicated individuals expressing suicidal ideation.  [Doc. 1 at ¶ 180(f)].  Of course, the record demonstrates that such standardized suicide checks had already been adopted for suicidal inmates; checks were required every ten minutes via camera, and every twenty minutes manually.[25]  [Doc. 102 at ¶ 38; Doc. 102-6 at 3].  Plaintiff does not point to any previous incidents in which this policy was found to be insufficient to protect suicidal inmates, or previous instances in which it was not followed.

Seventh and finally, Plaintiff focuses on Defendant Macias (though not by name).  [Doc. 1 at ¶ 180(g)].  She claims that Sheriff Warwick's continued employment of Defendant Macias as a jailer responsible for supervising intoxicated and suicidal inmates was constitutionally deficient, because he had communicated concerns about his lack of training, had a recent history of acting with deliberate indifference towards others, and had recently communicated his intention to resign following an investigation into misconduct.  [*Id.*].  As with the other deficiencies discussed above, Plaintiff does not cite to the record or case law to demonstrate that Sheriff Warwick's continued employment of Defendant Macias with these facts in mind represents deliberate indifference.  The Court is also unaware of any citation that could do so.  That Defendant Macias believed his training was insufficient is not enough to show that Sheriff Warwick acted with deliberate indifference in employing him; indeed, even where officers have testified that they are *completely* unfamiliar with

---

[25] While not addressed in the Parties' briefing, Plaintiff alleges (and Defendant Macias disputes) that he falsified two checks on Mr. Maes's cell.  But the failure to adhere to suicide prevention policies, such as cell checks, does not establish deliberate indifference.  *See Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation.");  *see also Hostetler v. Green*, 323 F. App'x 653, 657–58 (10th Cir. 2009).

a suicide prevention policy, "showing merely that additional training would have been helpful in making difficult decisions" has not been enough to "establish municipal liability." *George*, 32 F.4th at 1254 (citing *Connick v. Thompson*, 563 U.S. 51, 68 (2011)). That Defendant Macias allowed another inmate to escape from the SCJ in October 2019 is entirely disconnected from this matter, has no bearing on his ability to supervise intoxicated or suicidal inmates, and—contrary to Plaintiff's conclusory rhetoric—does not *per se* constitute deliberate indifference. *See* [Doc. 1 at ¶¶ 29–32, 180(g)]. Finally, Defendant Macias communicated his intent to resign on November 10, 2019, to become effective November 24, 2019. [*Id.* at ¶¶ 37–39]. The fact that Sheriff Warwick permitted Defendant Macias to continue working during the pendency of a standard two-week notice period does not give rise to a constitutional violation.

Taken together and in turn, these alleged deficiencies do not show a policy or custom with respect to supervision that amounts to deliberate indifference and that is the moving force behind Plaintiff's alleged injuries. As such, summary judgment is warranted with respect to Plaintiff's claims of inadequate supervision and the County Defendants' Motion is **GRANTED**.

## VI.   Count Four: Inadequate Training

Count Four is also raised against Sheriff Warwick in his official capacity, and alleges a policy or practice of inadequate training under § 1983. [*Id.* at ¶¶ 183–188]. Plaintiff points to five specific training deficiencies: (1) an expectation that jailers would make housing and classification decisions for intoxicated and suicidal inmates without the training to know when to elevate care decisions, (2) an expectation that jailers would respond to intoxicated and suicidal inmates without the training to understand suicide contracts, (3) an expectation that jailers would monitor intoxicated and suicidal inmates in cells with exposed bars using only monitor checks, and without the training to remove all items that could be used to facilitate suicide, (4) an expectation that

jailers would monitor intoxicated and suicidal inmates without training to account for the SCJ's physical plant, and (5) an expectation that jailers would have responsibility for obtaining mental health clearance for intoxicated and suicidal inmates without training to ensure that clearance is obtained.  [*Id.* at ¶ 185].

The County Defendants argue that summary judgment is warranted with respect to claims of inadequate training, because the Tenth Circuit has recently upheld the constitutionality of a similar training program and because the mere fact that more training was possible does not render this training program constitutionally inadequate.  [Doc. 102 at 16–18].  Plaintiff relies on contrary precedent from the Tenth Circuit, and alleges a variety of training deficiencies (albeit without citation to the record).  [Doc. 124 at 21–23].

In considering Plaintiff's inadequate training claim, the Court is mindful of the Supreme Court's teachings that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61.  To satisfy the deliberate indifference standard, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary,'" because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. at 62 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

To prevail under this standard, Plaintiff must demonstrate that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [Mr. Maes's due process] rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need for additional training."  *Jenkins*, 81 F.3d at 994 (internal quotation omitted).  It is not enough to "show that there were general deficiencies in the county's

56

training program for jailers." *Lopez*, 172 F.3d at 760.  Instead, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to his injury, *id*., so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury, *see City of Canton*, 489 U.S. at 385.

"To recover for a failure to train, [Plaintiff] needs to prove three elements: [1] the existence of a county policy or custom involving deficient training[,] [2] the policy or custom's causation of an injury[,] [and] [3] the county's adoption of a policy or custom with deliberate indifference." *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021).  To survive summary judgment, a reasonable juror must be able to conclude that Plaintiff has established each element.

With respect to the first element, the Court believes that a reasonable juror could find in favor of Plaintiff on two of her alleged deficiencies.  First, the record shows that jail staff was responsible for making housing and classification decisions for inmates, *see, e.g.*, [Doc. 124-1 at 69:11–70:4 (classification), 166:14–167:21 (housing)], but that they did not receive training on elevating care, *see* [Doc. 124-9 at 78:17–23].  Plaintiff has also developed record testimony that at least some jail staff did not receive training on removing items that could be used to facilitate suicide from the cells of intoxicated or suicidal inmates.  [Doc. 124-1 at 184:9–11].

Conversely, the Court has not found (and Plaintiff has not cited) any portion of the record suggesting that jailers did or did not receive training regarding "suicide contracts," shorthand referring to an agreement for an individual to refrain from self-harm.  *See supra* n.24.  Nor does any testimony demonstrate that training omitted discussion of the SCJ's physical plant and its attendant limitations.  Finally, the record does not show that jailers did not receive training to ensure that mental health clearance is obtained for intoxicated or suicidal inmates.  Mindful that it is insufficient to "show that there were general deficiencies in the county's training program for

jailers," *Lopez*, 172 F.3d at 760, and that Plaintiff must support any specific allegations with equally specific citations to the evidence at summary judgment, *see Certain Underwriters at Lloyd's London v. Garmin Int'l, Inc.*, 781 F.3d 1226, 1231 (10th Cir. 2015), she has nevertheless met her burden of establishing a policy or custom involving training with respect to elevating care and the removal of instruments to facilitate suicide from jail cells.

The Court next turns to consider whether Plaintiff has adduced evidence that these policies or customs caused Plaintiff's alleged injuries. *Lance*, 985 F.3d at 800. To establish this element, Plaintiff must demonstrate that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *City of Canton*, 489 U.S. at 391. As an initial matter, the Court notes that the County Defendants do not appear to challenge causation with respect to these allegations. But even assuming they had done so, the Court believes that a reasonable juror could find in Plaintiff's favor on the two alleged policies that are supported by the record. First, a reasonable juror could conclude that a lack of training in elevating care decisions led to Plaintiff's injuries. Had jail staff received such training, it is possible that Mr. Maes's intoxication and suicidal statements could have led to more immediate attempts to obtain medical care. [Doc. 124-9 at 91:5–13 ("Q[:] Okay. But would you agree that if there was training that could help staff identify potentially suicidal people and elevate those care decisions, that would be beneficial to preventing suicide, or at least potentially preventing suicide? . . . A[:] I think any training, not just in regards to that, but any training that's available to educate people regarding this is a good thing.")]. Second, training on removing instruments that could be used to facilitate suicide from cells housing intoxicated or suicidal inmates may very well have prevented Mr. Maes's death. Yet, without that training, jail staff remained under the impression that such instruments should remain in each cell. [Doc. 124-1 at 184:9–11 ("Q[:] Would you have removed

[the privacy curtain] from the cell?  A[:] No.  I would have asked him to hang it back up.")].  Given that the curtain was Mr. Maes's eventual means of suicide, it is apparent that a failure to remove it from his cell—or training to do so—may have played a causal role in his death.

Finally, the Court considers whether both policies were adopted or maintained with deliberate indifference.  *Lance*, 985 F.3d at 800.  "Deliberate indifference can exist when a county fails to train jail guards on how to handle recurring situations presenting an obvious potential to violate the Constitution."  *Id.* (citing *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997)).  To answer whether a problem is sufficiently "recurring" so as to necessitate training, the Tenth Circuit recently adopted a three-part test:

> 1. [T]he county's policymakers know "'to a moral certainty' that [their] employees will confront a given situation."
>
> 2. "[T]he situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult."
>
> 3. "[T]he wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights."

*Id.* (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).  Applying that test here, a reasonable juror could conclude that Sheriff Warwick knew "to a moral certainty" that SCJ staff members would confront inmates with medical and mental health problems that would require elevated care decisions.  The record supports as much.  [Doc. 124-9 at 91:5–13 (referencing benefits of providing training on elevating care decisions)].  Moreover—and setting aside debates over its adequacy—the fact that a suicide policy was in place at the SCJ is evidence that Sheriff Warwick and other policymakers were aware that SCJ staff would confront suicidal inmates.  Turning to the second factor, a reasonable juror could find that both situations presented employees with difficult choices that training could make less difficult.  Training with regard to elevating care decisions could, naturally, aid SCJ employees in making decisions regarding the type and degree

59

of mental health and medical attention that a given intoxicated or suicidal inmate requires. And training with regard to removing instruments of suicide could similarly aid SCJ employees in ensuring that intoxicated or suicidal inmates are unable to harm themselves. Third and finally, the wrong choice in either of these areas may lead to a deprivation of an individual's constitutional rights. As discussed *supra*, "claims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie*, 119 F.3d at 866. Failing to make choices that could prevent jail suicides may therefore cause the deprivation of a pretrial detainee's rights arising under the Fourteenth Amendment. Failing to elevate mental health or medical care decisions when facing an intoxicated or suicidal inmate could frequently cause suicide or self-harm, as could failing to remove instruments to facilitate suicide from the jail cell of an intoxicated or suicidal inmate. As such, the Court believes that a reasonable juror could determine that Sheriff Warwick's policy of inadequate training with respect to both specific deficiencies was adopted or maintained with deliberate indifference to the consequences.

The Court is, of course, aware that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. It also acknowledges the County Defendants' reliance on recent Tenth Circuit precedent upholding similar training programs. Specifically, in *George v. Beaver County* the Tenth Circuit reasoned that a suicide-prevention policy that included four hours of suicide prevention training as part of a twelve-week program—along with on-the-job training—did not demonstrate deliberate indifference even though officers testified that they were unfamiliar with the suicide prevention policy. 32 F.4th at 1254. First, as Plaintiff points out, the training program in *George* appears to have included more training than that received by SCJ staff. [Doc. 124 at 21 n.2 (citing Doc. 124-13 at 37:18–25)]. Second—and more broadly—the reasoning employed in *George* addresses the

adequacy of the suicide prevention program as a whole (rather than specific deficiencies).  To that end, the Tenth Circuit held that "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."  *Id.*.  Here, Plaintiff is not simply asking for "additional" training.  Instead, she has raised *specific* allegations, supported by record evidence, of insufficient training in two discrete areas with a connection to Mr. Maes's suicide.  It follows that—even assuming the *George* defendants' approach to training is substantially similar to that offered to the SCJ staff—the Tenth Circuit's reasoning in *George* does not foreclose Plaintiff's ability to succeed on the specific failure-to-train allegations here.

As such, Plaintiff's inadequate training claims—as they relate to a failure to train jail staff on elevating care, [Doc. 1 at ¶ 185(a)], and removing items that could be used to facilitate suicide from jail cells holding intoxicated or suicidal inmates, [*id.* at ¶ 185(c)]—are not subject to summary judgment.  The Motion is **DENIED** with respect to those allegations.  All other failure-to-train allegations contained in Count Four are subject to summary judgment in the County Defendants' favor and the Motion is respectfully **GRANTED** with respect to those allegations.

## VII.    Count Five: Inadequate Staffing

Lastly, Plaintiff raises a third claim against Sheriff Warwick in his official capacity under § 1983 for adopting or maintaining a policy or practice of inadequate staffing at the SCJ.  [Doc. 1 at ¶¶ 189–193].  The Estate outlines three specific deficiencies: (1) a failure to provide adequate staffing to supervise intoxicated inmates experiencing suicidal ideation, (2) reliance on untrained or inexperienced staff to supervise high-risk inmates, and (3) reliance on a single jailer/dispatcher structure.  [*Id.* at ¶ 191].

The County Defendants move for summary judgment on Plaintiff's inadequate staffing claim, principally basing their argument on causation.  [Doc. 102 at 18–19].  They point out that

the single jailer/dispatcher model was not employed at the time of Mr. Maes's suicide, and note that Plaintiff did not allege or develop testimony regarding constitutionally adequate levels of staffing at the SCJ. [*Id.*]. Rather than address each of the specific deficiencies in the Complaint in turn, Plaintiff uses the Response to argue that the "cumulative impact" of Sheriff Warwick's staffing decisions led to Mr. Maes's death. [Doc. 124 at 23–25]. She also argues that the County Defendants are misrepresenting the single jailer/dispatcher model, and that they cannot demonstrate that Mr. Maes was dead before Defendants Macias and Shields changed shifts. [*Id.*].

Understaffing may constitute a municipal policy or custom that can form the basis for liability under § 1983. *See Burke v. Regaldo*, 935 F.3d 960, 1001 (10th Cir. 2019) (affirming jury's conclusion that sheriff was responsible for "an unconstitutional policy or custom . . . of poor training, inadequate staffing, and lack of urgency surrounding jail medical care"); *Garcia*, 768 F.2d at 307–08 (reasoning that deliberate indifference could be "shown by proving that there are such gross deficiencies in staffing, facilities, equipment or procedures that the inmate was effectively denied access to adequate medical care"); *Morgan v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, No. CIV-08-1317-R, 2010 WL 11508854, at *9 (W.D. Okla. Mar. 11, 2010) ("A reasonable jury could also find from the evidence concerning conditions at the jail that the need for . . . increased staffing of the jail was so obvious and so likely to result in the violation of detainees' Fourteenth Amendment rights, resulting in injuries to or deaths of detainees, that [the sheriff] can reasonably be said to have been deliberately indifferent to such need or needs.").

As with Plaintiff's other municipal liability claims, Plaintiff must supply record evidence of (1) the existence of a policy or custom, (2) causation, and (3) deliberate indifference in order to survive summary judgment. *See Schneider*, 717 F.3d at 769–71. Here, the Court assumes— without deciding—that each of Plaintiff's three alleged policies or customs stemming from

understaffing actually are policies or customs. The Court's analysis therefore turns on whether Plaintiff has supplied record evidence to demonstrate that the specific policies caused Plaintiff's injuries and that they were enacted or maintained with deliberate indifference to Mr. Maes's constitutional rights.

Turning to Plaintiff's first challenged policy—that Sheriff Warwick simply provided an inadequate number of jail staff members to supervise intoxicated individuals experiencing suicidal ideation—the Court concludes that summary judgment is appropriate. *See* [Doc. 1 at ¶ 191(a)]. First, Plaintiff has pointed to nothing in the record suggesting that the presence of additional jail staff on the night of November 16, 2019 would have prevented Mr. Maes's death. Indeed, portions of the record independently located by the Court suggest the opposite. *E.g.* [Doc. 124-1 at 120:18– 121:1 ("Q[:] Were you understaffed in 2019?  A[:] We had the correct amount of people on staff that night, because we're understaffed. Sometimes we have to pull double shifts or sometimes the sheriff or I even have to cover for shifts. *So we make sure we have the appropriate amount of people on shift at a time.* And at the same time, we could always hire three or four more people, because we're understaffed. It's not about the staffing issue." (emphasis added))].

Plaintiff's second challenged policy also fails to survive summary judgment. Plaintiff charges that Sheriff Warwick maintained a policy of relying on untrained or inexperienced staff to supervise high-risk inmates. [Doc. 1 at ¶ 191(b)]. Yet nowhere in the Response—or, as far as the Court is aware, in the record—does Plaintiff point to a specific degree of qualification required for the supervision of high-risk individuals, or explain how Defendant Macias's and Shields's lack of qualifications and experience caused Mr. Maes's death.

Finally, Plaintiff's third challenged policy—the use of the single jailer/dispatcher model— also fails on causation grounds. [*Id.* at ¶ 191(c)]. As its name suggests, the single jailer/dispatcher

structure involves using one individual as both jailer and dispatcher at a given time. *See* [Doc. 102 at ¶ 7; Doc. 102-2 at 48:4–49:20]. At the time of Mr. Maes's suicide, however, the single jailer/dispatcher structure was not in use; both Defendant Macias and Defendant Shields were present at the SCJ acting as jailer and dispatcher, respectively.[26] [Doc. 102 at ¶¶ 10, 12]. Plaintiff nevertheless argues that the County Defendants have misrepresented the "operation of the jailer/dispatcher post," claiming that Cell One was unsupervised because Defendant Macias was preoccupied with other inmates while Mr. Maes put his suicide plan into motion and Defendant Shields was preoccupied with other tasks. [Doc. 124 at 24–25]. First, this much seems to concede that two staff members were present at the SCJ at the time of Mr. Maes's death. Second, accepting that two staff members were present at the SCJ—and that this staffing was inadequate—presumes that the presence of three or more staff members would have prevented Mr. Maes's death. But Plaintiff does not explain how the addition of another staff member would have saved Mr. Maes's life. Plaintiff's failure to develop record evidence on this point, whether through the use of experts or otherwise, vitiates the argument.

Plaintiff raises one final argument: that the medical examiner did not identify Mr. Maes's time of death, and that it is possible that he was still alive when the single jailer/dispatcher structure was employed beginning at midnight on the night of Mr. Maes's suicide. [Doc. 124 at 25]. Respectfully, this argument defies the record. At approximately 10:22 p.m., Mr. Maes began

---

[26] Plaintiff, somewhat confusingly, appears to dispute that Defendant Shields was acting as a dispatcher, noting that she "called herself a 'detention deputy,' not a 'dispatch deputy.'" [Doc. 124 at 2, ¶ 3]. Regardless of Defendant Shields's self-identification, it remains the case that the single jailer/dispatcher structure was not in use prior to midnight on November 16, 2019. Moreover, while Plaintiff argues that the County Defendants "misconstrue" Defendant Shields's role in the dedicated dispatcher post, [*id.*], she also admits that "[t]he only person able to supervise [Mr. Maes] was Shields in the dispatcher/jailer post," [*id.* at 9, ¶ 15]. Finally, Plaintiff admits that it is undisputed that "Shelby Shields was the dispatcher on duty" at the time of Mr. Maes's arrest. [Doc. 102 at ¶ 4; Doc. 124 at 1].

hanging himself using the privacy curtain in his cell.[27]  [Doc. 102 at ¶ 34].  Only one hour and

thirty-eight minutes later did Defendants Macias and Shields end their shifts, replaced by a single

jailer/dispatcher.  [*Id.* at ¶ 36].  The independent coroner who examined Mr. Maes—endorsed as

an expert by both parties—testified that death would have occurred within three minutes after Mr.

Maes's body stopped moving (though also allowing for a range of two to four minutes).  [Doc.

102-7 at 99:4–24].  Nevertheless, Plaintiff claims that Mr. Maes may still have been alive by

midnight, arguing that jail video cannot determine when movement stopped and that there is no

recording of his left hand reaching inside the ligature around his neck.  [Doc. 124 at 25].

Respectfully, the Court does not believe that this argument precludes summary judgment

in favor of the County Defendants.  While summary judgment requires the Court to draw all

inferences in favor of Plaintiff, a "genuine" factual dispute requires more than a mere scintilla of

evidence.  *Anderson*, 477 U.S. at 252.  Instead, "there must be evidence on which the jury could

reasonably find for" Plaintiff.  *Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 505 F. Supp. 2d

1178, 1184 (D. Utah 2007).

Here, Plaintiff's own allegations demonstrate that Mr. Maes began hanging himself at

approximately 10:22 p.m.  [Doc. 1 at ¶ 131 ("At 10:21:59 p.m., video shows Jackson's legs swing

off the lower bunk.")].  Plaintiff further alleges that "[w]hile jail staff socialized in the dispatch

room, [Mr. Maes] succumbed to his illness and perished around 10:30 p.m."[28]  [*Id.* at ¶ 2].

Accepting Plaintiff's argument now would therefore require setting aside some of the very

allegations that underlie this lawsuit.

---

[27] Plaintiff only "generally admit[s]" this fact, and disputes any inference as to time of death.  [Doc.
124 at 5, ¶ 34].

[28] To the extent Plaintiff argues that midnight is "around 10:30 p.m.," the Court does not believe
that a reasonable juror could conclude the same.

This pattern repeats itself as Plaintiff challenges the reliability of the video system in the Response—a notable contrast to the repeated emphasis upon the clarity, [*id.* at ¶ 132], and unobstructed view, [*id.* at ¶ 138], provided by the video recording that expressed in the Complaint. The Court is mindful that its role is not to weigh evidence at the summary judgment stage, but can find no support in the record—beyond Plaintiff's speculation—for the proposition that Mr. Maes remained alive for nearly an hour and forty minutes after hanging himself.  It follows that summary judgment is appropriate with respect to Plaintiff's claims stemming from allegedly inadequate staffing at the SCJ.  This Court thus respectfully **GRANTS** the Motion with respect to Count Five.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

1. The Court **GRANTS IN PART** the County Defendants' Motion for Partial Summary Judgment, [Doc. 102], as follows:

   a. Summary judgment is awarded to the County Defendants with respect to Counts One, [Doc. 1 at ¶¶ 167–72], Three, [*id.* at ¶¶ 178–82], Five, [*id.* at ¶¶ 189–93], Nine, [*id.* at ¶¶ 200–01], and Ten, [*id.* at ¶¶ 202–03]; and

   b. Summary judgment is awarded to the County Defendants with respect to Count Four, insofar as Plaintiff raises claims based on a lack of training regarding suicide contracts, [Doc. 1 at ¶ 185(b)], regarding the physical, funding and staffing decisions of the SCJ, [*id.* at ¶ 185(d)], and regarding mental health clearance for intoxicated persons expressing acute suicidal ideation, [*id.* at ¶ 185(e)].

2. The Court **DENIES IN PART** the County Defendants Motion for Partial Summary Judgment, [Doc. 102], as follows:

    a.  Plaintiff's conditions-of-confinement claim stemming from inadequate funding, [Doc. 1 at ¶ 173–77], shall proceed to trial;

    b.  Plaintiff's claims raised against Defendant Wilson in Counts Six, [*id.* at ¶¶ 194–95], and Seven, [*id.* at ¶¶ 196–97], shall proceed to trial; and

    c.  Plaintiff's inadequate training claims, as they relate to a failure to train jail staff on elevating care, [Doc. 1 at ¶ 185(a)], and removing items that could be used to facilitate suicide from jail cells holding intoxicated or suicidal inmates, [*id.* at ¶ 185(c)], shall proceed to trial.

3. The Court **GRANTS** Defendant Elke Wells's Motion for Summary Judgment, [Doc 104];

4. The Court **DENIES** Plaintiff's Motion to Supplement Responses, [Doc. 149];

5. The Court **DENIES** Plaintiff's Motion to Strike, [Doc. 169];

6. The Final Pretrial Conference in this matter **REMAINS SET** for March 8, 2023 at 11:00 a.m. in Courtroom A-502 before Judge Nina Y. Wang; and

7. Any updates to the Parties' previously-submitted proposed final pretrial order **REMAIN DUE** on or before March 1, 2023. The Parties shall file a copy of any updates to the proposed Order via CM/ECF and shall send a Word version to Wang_Chambers@cod.uscourts.gov.

DATED: February 3, 2023                     BY THE COURT:

                                            Nina Y. Wang
                                            United States District Judge